[No. 21431-8-II. Division Two. February 12, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS R. KARPENSKI, *Appellant*.

82

ARMSTRONG, J., dissents in part by separate opinion.

*Lenell R. Nussbaum*, for appellant.

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

MORGAN, J. — Thomas R. Karpenski appeals his convictions for first degree rape of a child and first degree child molestation. Holding that a child witness was incompetent to testify at trial and that hearsay was erroneously admitted, we reverse and remand.

Z was born on June 9, 1989. His mother, MM, was single and employed. As a result, her parents, Z's maternal grandparents, have been heavily involved in raising him.

At all times relevant here, Z told imaginary stories containing vivid detail. He falsely claimed, for example, that he had spoken with his deceased uncle, that his mother had won $10,000, and that he had gone skydiving. In the skydiving story, "he even had the colors of the parachute."[1] According to his mother, he sometimes went "for months believing his stories."[2] According to his grandmother,

> . . . [H]e always exaggerates. He always insists—that's a normal thing for him. —Much more so than I would think most kids. I was a day care director for five years and I've been around children ages one to six, and I never encountered—I mean, kids tell stories, but you usually know—you can usually tell them that's not real and they'll accept that. Z does not accept it.[3]

In May 1992, Z's mother began dating Karpenski. In

---

[1]Report of Proceedings at 37 (Oct. 17, 1996).

[2]Report of Proceedings at 36 (Oct. 21, 1996).

[3]Report of Proceedings at 9 (Oct. 22, 23, 1996).

1993, she became pregnant with Karpenski's child. In April 1994, she gave birth to Matthew, Z's half brother.

In June 1994, MM, Z and Matthew moved into Karpenski's house. Z slept in a sleeping bag on the living room couch "for like . . . two nights," until his and Matthew's bedroom was ready for occupancy.[4]

In July 1995, an Oregon family with twin six-year-old sons was visiting for a week in Karpenski's neighborhood. Z and the twins played together each day. One afternoon, the twins' mother told her husband, the twins' father, that the twins and Z were playing in the bushes with their pants down. The record does not show what, if anything, the mother actually saw the three boys doing; she never testified, and the twins' father, who did testify, did not know whether his wife had actually seen what she was describing.[5]

In any event, the father reacted by calling the twins inside and asking what they were doing. The twins said that Z was showing them "how to put his pee-pee in their bottom." Understandably disturbed, the father "caught Z, he was walking by or something," and asked "who showed him how to put his pee-pee in a bottom."[6] At first, Z said "it didn't happen." Then, Z said "he learned it from [the twins].'"[7] The father retorted, "My boys could not have shown you because they don't know" about such things,

---

[4]Report of Proceedings at 41 (Oct. 21, 1996); Report of Proceedings at 40 (Oct. 22, 23, 1996).

[5]The father testified:

Q: [D]id she have a conversation with your two sons or did she see what was going on?

A: I'm not positive if my sons told her or she saw. You know, she saw them in the bushes back there. It's a big, huge hedge of bushes in the back and the boys were swinging around and playing, they were playing fort and stuff.

Report of Proceedings at 73 (Oct. 17, 1996); *see also Id.* at 170; *Id.* at 178.

[6]*Id.* at 171, 172.

[7]*Id.* at 81.

and asked again, "How did you learn it?"[8] At that point Z finally said, "Well, my mom's boyfriend spends the night at my mom's house. I sleep in the living room in my sleeping bag, and he comes in the middle of the night and tears my clothes off."[9]

The twins' parents did not pursue the matter with any of the boys. They did, however, write a letter to Z's mother, whom they had not met. Then they returned to Oregon with their children.

When Z's mother received the twins' parents' letter, she asked Z "if this was true and he said no."[10] She "couldn't go talk to . . . the lady that wrote [the letter], because they were gone . . . back to Oregon where they lived."[11] She asked R, a neighbor whose daughter often played with Z, whether R knew of any sex play between the children. R did not, but R had heard Z say he did not want to go home "because Tom was there."[12] Apparently linking the letter to what she had heard Z say, R "asked [MM] to take [Z] to the hospital and to get him out of [Karpenski's] house."[13] MM chose not to comply, so R called Z's maternal grandmother and Child Protective Services (CPS).

The grandmother reacted to R's call by speaking with Z. According to her later testimony:

A: . . . [R] told me that supposedly [Z] had talked to a man neighbor, the father of the twins, about Tom abusing him.

. . . .

A: . . . Z told me, no, he didn't talk to a man, he talked to their mommy. And I said, "Did you see a man?" And he said, "No."

---

[8]*Id.*

[9]*Id.* at 173.

[10]Report of Proceedings at 37 (Oct. 21, 1996). *See also* Report of Proceedings at 32 (Oct. 17, 1996) (MM "asked [Z] about it and he denied it to me").

[11]*Id.* at 47.

[12]Report of Proceedings at 62, 67 (Oct. 21, 1996).

[13]*Id.* at 56.

Q: And did he say what he told the mother?

A: He told the mother that the little boys wanted him, the twins, wanted him to play go to the kissing fort and play pee-pee in the butt. And I . . . asked him at that time, "Did you do that?" And he said, "No, I went and talked to their mommy." And then . . . his mother called him home.[14]

CPS reacted to R's call by requiring MM to remove Z from Karpenski's house. Thus, on or about July 28, 1995, MM, Z, and Matthew moved to MM's parents' house. CPS also required MM to take Z to mental health counseling, which apparently lasted for a few weeks.

In September 1995, Z started the first grade. "[W]hen his teacher asked him what he did over summer vacation," he said, according to his mother, that he and his little brother "went to Hawaii, and the warm water was splashing on his legs and.they were . . . eating pineapple, and the trees were whispering in the wind and it was so warm . . . ."[15] According to his grandmother,

He told us . . . , and he relayed this to his teacher also, that he had been to Hawaii, very vividly that he'd been to Hawaii, down to the fact that he described the feel of the water on his feet, the smell, the plane trip. He's never been in a plane. And it was very hard to convince him that he didn't do that.

There ha[ve] been times when we've been in the car riding somewhere and he'll insist that he's done something, he's either been in a plane or he's jumped off a cliff or whatever, and we've had to tell him, no, you didn't do that, and he gets very angry and says yes, he did, that he's done it and we just don't remember it.[16]

When the first grade teacher learned that Z had not actually been to Hawaii, she referred him to the school

[14]Report of Proceedings at 6 (Oct. 22, 23, 1996).

[15]Report of Proceedings at 50 (Oct. 17, 1996).

[16]*Id.* at 129-30.

psychologist, who in turn referred him to mental health counseling. The counseling apparently lasted until spring.

On November 14, 1995, Z's mother and maternal grandfather took him to the county courthouse for an interview with a child interviewer employed by the Pierce County Prosecutor's Office. As they left the grandparents' house, Z's mother told him, according to her, "that somebody was going to be asking him questions about Tom,"[17] and "he had to tell them the truth."[18]

Upon arriving at the courthouse, the mother and grandfather spent 15 minutes in conference with the child interviewer while Z played in a separate room. At the end of that time, the interviewer directed the mother and grandfather to wait outside while she interviewed Z. During the conference, according to the child interviewer, both the mother and grandfather made it

> very clear . . . that to them these allegations were not true, and the information that they provided me was kind of a background about how some neighbors had come up to [Z's mother] and indicated that . . . her boyfriend at the time was a child molester.[19]

The interviewer spoke with Z for about 35 minutes. No one else was present. She did not tape the interview, or seek consent to tape it, in accordance with a policy of her office.[20] She took notes that she destroyed after typing a report, again in accordance with a policy of her office.[21]

Near the beginning of the interview, the interviewer asked three simple questions designed to show whether Z understood the difference between the truth and a lie. The first was whether she would be telling the truth or lying if she were to claim that she was a boy. The second was

---

[17]*Id.* at 33.

[18]*Id.* at 34.

[19]*Id.* at 88.

[20]*Id.* at 104; *see also id.* at 109-10.

[21]*Id.* at 104; *see also id.* at 109-10.

whether she would be telling the truth or lying if she told Z his hair was on fire. The third was whether a truth or a lie was better. Z's responses are not in the record, but we assume he answered appropriately.[22]

After these preliminaries, the interviewer began to explore whether Z had been sexually abused. Her questions and Z's answers were as follows: (1) The interviewer asked "if anything had ever made [Z] feel uncomfortable." Z said, "One time when I was in my bed in my sleeping bag at home, I got my [bottom] wet and Tom came in and wiped my [bottom]."[23] Z explained, in child's terms, that he had defecated, neglected to clean his anus, and awakened while Karpenski "was wiping him with toilet paper underneath his clothing."[24] (2) The interviewer did not consider this "something sexual in nature," so she "press[ed] Z further" by asking "if Tom had ever done anything to make him feel unsafe."[25] Z answered, "That's all."[26] (3) The interviewer "explained to Z that someone thought something might have happened to make him feel unsafe," and "asked if they got that right or if they got that mixed up."[27] Z responded, "What were they talking about?"[28] (4) The interviewer "told [Z] that I meant anything that made him feel unsafe," and Z said, "I can't remember it all because my mom only told me that one thing."[29] (5) The interviewer "asked if his mom told him about what happened with

---

[22]*Id.* at 109.

[23]Z used the word "boobs," but explained he meant his "bottom." Report of Proceedings at 92-93 (Oct. 17, 1996); Report of Proceedings at 89 (Oct. 21, 1996).

[24]*Id.* at 90.

[25]Report of Proceedings at 94 (Oct. 17, 1996); *see also Id.* at 116.

[26]*Id.* at 94.

[27]*Id.*

[28]*Id.* at 95.

[29]*Id.*

Tom," and Z said, "Yes, [when we] were about to go."[30] Clarifying, the interviewer asked if Z was talking about "today, meaning the day of the interview," and Z said, "Yes."[31] (6) The interviewer asked if Z "had said he couldn't remember all of the things that happened with Tom," and Z replied, "No, he can't remember all of them."[32] (7) The interviewer asked if Z would tell her "about one thing,"[33] and Z said, "Only that just one thing," adding, "I can't remember all of them."[34] (8) The interviewer "told Z that someone thought he told them about some other things that happened with Tom," and "asked if they got that right or if they were mixed up." Z said, "Right."[35] (9) The interviewer asked "what else Tom did." Z said, "That's all."[36] (10) The interviewer "asked Z if he told anyone else about things Tom did," and Z said, "No."[37] (11) The interviewer "told Z that someone thought he told them about some things that happened with Tom without the toilet paper," and "asked if they got that right or if they were mixed up." Z said, "Yes."[38] (12) The interviewer "asked Z what else Tom did," and Z said, "One thing. He took his private area and put it in my butt. He made me upset. That's one thing he did."[39]

Immediately following this twelfth response, the interviewer began to question about when and how the alleged

---

[30] *Id.*

[31] *Id.* At this point, according to the interviewer, she understood Z to be saying "that his mom had told him something about what Tom had done to him," and that "she had said that to him that day prior to coming to the interview." *Id.* at 95-96.

[32] *Id.* at 96.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* at 97.

[37] *Id.*

[38] *Id.*

[39] *Id.*

abuse had occurred. She started "by trying to ascertain" if "the toilet paper incident . . . was on the same day or a different day." Z "said [the abuse] was after Tom had flushed the toilet paper." He "went on to describe that he was in the living room still and that Tom was sitting in a chair and that he apparently was laying down and he put his private in his butt."[40] When the interviewer "asked [Z] to explain how that happened," Z "demonstrated by getting down and laying, moving forward off the chair and putting both hands on either side of Z and basically laying over him."[41] Z said "that Tom was wearing a robe at that time, and that his [Tom's] private went up inside his [Z's] body and it stayed still."[42] When the interviewer asked "whether this had happened on one occasion or more than once," Z said, "One time."[43] When the interviewer sought to establish a "kind of a general time frame," however, Z

> indicated that it had happened more than one time. He described that it had happened when he was in first grade and before first grade. And he said that he was five when it happened. He also—when I asked him if anything happened in kindergarten, he said no.
>
> Q: Was he indicating to you that it had happened more than one time or just one time?
>
> A: He said one time. His answer would always—usually would say more than one thing like first grade and before first grade, and the impression was more than one, but when I asked him he said one time.[44]

Inexplicably, Z also said the abuse had occurred, "Tonight after school."[45]

Attempting to obtain more details, the interviewer asked

---

[40]Report of Proceedings at 98 (Oct. 17, 1996).

[41]*Id.*

[42]*Id.*

[43]*Id.* at 99.

[44]*Id.*

[45]*Id.* at 121; Report of Proceedings at 112-13 (Oct. 21, 1996).

whether Karpenski had used his "private" to touch any part of Z other than his "butt," and Z "never said anything about having Tom's private touch his private."[46] The interviewer asked whether Karpenski "ever touched [Z] with anything besides his private," and Z said no,[47] Karpenski had kept his hands at his sides.[48] Lastly, the interviewer asked whether Karpenski's "private was hard like a stick" or "soft like a worm," and Z said, "Hard, kind of medium."[49]

Because the interview was not videotaped, the record does not actually depict Z's nonverbal manifestations. According to the interviewer's oral testimony, Z's "body language" changed "during the time that he was talking about the event with Tom."[50] "[H]e stopped coloring" and "he was very near tears most of that portion of the interview . . . ."[51] "[H]e never started crying, but he spoke very softly."[52] Near the end, he "kind of said that he had found the solution," which was "mov[ing] to his grandparents' so it couldn't happen again."[53]

After the interview, MM, Z, and Z's grandfather returned to the grandparents' house. According to the grandmother, Z

> didn't say anything when he came home, but at night when I put him to bed I always read to him. And after we read our story, . . . he said, "Do you want to know what they asked me today?" And I said, "No." And he said, "Well, they said Tom hurt me." I said, "Did Tom ever hurt you? Has he ever been

---

[46]*Id.* at 118.

[47]Report of Proceedings at 120 (Oct. 17, 1996); Report of Proceedings at 116 (Oct. 21, 1996).

[48]Report of Proceedings at 120 (Oct. 17, 1996); Report of Proceedings at 116 (Oct. 21, 1996).

[49]Report of Proceedings at 97 (Oct. 21, 1996).

[50]Report of Proceedings at 99 (Oct. 17, 1996).

[51]*Id.* at 100.

[52]*Id.*

[53]Report of Proceedings at 98-99 (Oct. 21, 1996).

mean to you?" "No." I said, "Well, what happened?" "Well, he touched me and then he put pepper in my ear." And I said, "Pepper in your ear?" And he said, "Yeah, red pepper in my ear." And I looked at him and just kind of, okay, and dropped it. And that was all that was said.[54]

On November 22, 1995, MM took Z to a sexual assault center for physical examination. The doctor spoke with Z alone, after asking MM to wait outside. When the doctor asked Z if anyone had ever touched him or made him feel uncomfortable, Z shook his head yes, then said "Tom."[55] When the doctor asked what Tom had done to Z, Z said, "He touched me."[56] When the doctor asked when Tom had touched him, Z said, "A long time ago."[57] When the doctor asked if Z was feeling safe now, he shook his head yes and said, "Yes, I'm at grandma's."[58] When the doctor asked whether Tom had touched him one time or more than one time, Z said one time.[59] When the doctor asked where Tom had touched him, Z pointed to his bottom.[60] When the doctor asked how the touching had felt, Z said it felt "uncomfortable."[61] When the doctor asked whether it had hurt, Z again said it "was uncomfortable." When the doctor asked if Tom had touched him on his skin or on his clothes, Z said, "On my skin." When the doctor asked if the touching had occurred on the outside of his body or the inside, Z said inside.[62] When the doctor asked if Z knew what had touched him, he said he couldn't tell. When the doctor asked whether anyone else had ever touched him or made

[54]Report of Proceedings at 130-31 (Oct. 17, 1996).

[55]Report of Proceedings at 145 (Oct. 21, 1996).

[56]*Id.*

[57]*Id.*

[58]*Id.*

[59]*Id.*

[60]*Id.*

[61]*Id.*

[62]*Id.* at 145-46.

him feel uncomfortable, Z said no. Overall, the doctor perceived Z to be saying "that the touching had happened on his bottom, on his skin, and that he didn't know what it was that had done the touching."[63]

The doctor had MM return to the room for the physical portion of the examination. The doctor concluded that Z's anus and genitals were normal, and that "[i]t was actually a pretty normal exam."[64] She testified at trial, however, that a normal physical examination is "not inconsistent" with anal intercourse, and that "even after anal intercourse, there are very few findings."[65]

In late November or early December 1995, MM and Matthew moved back to Karpenski's house. Z continued to live with his maternal grandparents.

On January 18, 1996, the State charged Karpenski with one count of first degree rape of a child in violation of RCW 9A.44.073.

Around April 1996, at the suggestion of Z's mental health counselor, MM began "reality checking" with Z. According to MM, this involved "exercises we do with Z when he's telling us a story and we're not really sure."[66]

On October 8, 1996, the child interviewer and a deputy prosecutor again interviewed Z. This interview was in preparation for trial, which was to begin on October 17, 1996. Once again, MM was directed to remain outside.[67] After the deputy prosecutor had Z answer some simple questions about the difference between the truth and a lie, he "questioned [Z] about the touching that happened." According to the interviewer, Z did not start, as he had before,

---

[63]*Id.* at 146.

[64]Report of Proceedings at 147 (Oct. 21, 1996).

[65]*Id.* at 148.

[66]Report of Proceedings at 37 (Oct. 17, 1996).

[67]MM later testified she could overhear questions being put to Z, and she "felt that they were suggestive." Report of Proceedings at 59 (Oct. 17, 1996). According to her, she also heard Z say, "Tom didn't do anything," and then later, "I don't remember." *Id.* at 59-60.

by saying he could not remember.[68] On the contrary, "actually, he described an incident with Tom's hands on his private"[69]; more specifically, he now claimed, for the first time, "that Tom's hands had touched his private, and indicated his front private, his genital area."[70] Because Z had expressly "said that never happened"[71] during the "forensic interview" held eleven months earlier, the deputy prosecutor followed up by "ask[ing] him some questions about other kinds of touching."[72] Z responded, "I don't know," which prompted the child interviewer to intervene and ask "if he had told me about some other things that happened."[73] Z said yes, but that he did not want to talk about those things.[74] Soon, however, he again described an anal rape—although much differently from before. When the prosecutor asked, "What did [Tom] touch your back private or your butt with?" Z said, "With a coat hanger" that "felt cold."[75]

On October 16, 1996, the day before trial was to start, the State amended the information to add a count charging first degree child molestation. The new count was based on the allegation of fondling that Z had first made in the October 8 interview.

On the morning of October 17, 1996, the trial court held a brief competency hearing. Z was the only witness, and he was not asked about the events in dispute. He answered appropriately when asked whether it would be the truth or a lie to say he was a donkey, and whether it would be the truth or a lie to say a pink elephant was in the back of the

---

[68]Report of Proceedings at 122-24 (Oct. 17, 1996).

[69]*Id.* at 122.

[70]*Id.* at 123.

[71]*Id.*

[72]*Id.* at 124.

[73]*Id.* at 125.

[74]*Id.*

[75]Report of Proceedings at 119, 121 (Oct. 21, 1996).

courtroom. He expressly promised to tell the truth without making up stories, but then testified as follows:

Q: [Z], you said you were seven years old; is that right?

A. Yeah.

Q. Do you remember when your brother, Matthew, was born?

A. I can't remember when he was born.

Q. Do you remember when—

A. He was born right after me, at the same time.

Q. At the same time as you were born?

A. I was first and then he was second.

Q. Okay. Well, when you say the same time, what do you mean?

A. The same time as I was born and, uhm, in '69, 1989.

Q. How old is your brother, Matthew?

A. Two.

Q. If he's two and you're seven, how can he be born at the some time?

A. Well, because—because my—because there was two of us and—in my mommy's tummy, but we were in separate—we were separate, because I was hooked up to this side of my mommy's tummy and Chewy [Z's nickname for Matthew] was hooked up to this side of mommy's tummy.

Q. And we're talking about Matthew?

A. Uh-huh, and me.

Q. Okay. And you're sure that you were born at the some time?

A. Uh-huh, because after they got me out, they had to stitch the part where I came out and then—and then Chewy was after me, because they had to drain out all the blood off me and cut the umbilical cord.

Q. How long after you were out was he taken out?

A. Well, my mommy had to push and then my baby—and then Tom's little baby came out.

Q. And that's Matthew?

A. Yep.

Q. But do you know how long after you were out that happened?

A. How long was I out? Uhm, they had to dry off my blood and then they had to put me in this little case, this little bed in a thing. And then—and then after, after that, after Chewy was born, then my mommy came over to me and them little holes, she put her hands in the holes and she rubbed my forehead.

Q. And that's when you were just a tiny little baby?

A. Yep. I was about that long. (Indicating)

Q. You're like an ant there.

A. Yeah, I know.

Q. That's pretty small.

A. Yep.

Q. Yeah. Do you have any other brothers or sisters?

A. I just have him, Matthew. I just have Matthew.

Q. Do you live with Matthew right now?

A. No. He—he lives with Tom and mommy, and I live with my pa and grandma and [aunt].

Q. Right, okay, And you're sure that's—

A. Uh-huh.

Q. —as far as your brother, Matthew, being born—

A. Yeah, uh-huh.

Q. —you're sure he was born the way you just described?

A. Uh-huh. Right after I was.

Q. Okay.[76]

At the end of the competency hearing, the trial court rendered a somewhat confusing oral opinion in which it found Z competent. Quoted in its entirety, that oral opinion was as follows:

Well, [Z] did testify as to an event that he could not possibly have recalled. I mean, it's beyond understanding, as far as I'm concerned, that he would be in the same room when his little brother, Matthew, was born. It is impossible for him to recall when he was born and what he looked like and what occurred.

It is apparent to me when [Z] was testifying here regarding this that he was testifying as to dream versus reality. And I think that was confused and I don't think he is old enough to be able to separate that confusion, reality from fact.

However, as far as his competency to testify and demonstrate a sufficient memory and to understand questions regarding an event, an actual event, that has been demonstrated here.

I'm going to make a finding that he is competent to testify.[77]

This oral opinion is our only indication of the trial court's reasoning, for it chose not to enter written findings of fact.

Following the competency hearing, the trial court held a hearsay hearing at which several witnesses testified, generally as set forth above. The court ruled, over Karpenski's objection, that Z's hearsay statements were admissible.

Following the hearsay hearing, the court commenced a jury trial. Z was the first witness. After he took the oath and responded to various preliminaries, he was asked what had happened. He replied, "I can't remember."[78] He was then asked whether he remembered coming to the courthouse and talking to the child interviewer. He replied that

---

[76]Report of Proceedings at 21-24 (Oct. 17, 1996).

[77]*Id.* at 30, 31.

[78]*Id.* at 192.

he did, and that Karpenski's "front private" had touched his "front private," on "the skin," while he was out of his sleeping bag with his clothes on.[79] The prosecutor then reminded him that when he had talked to the child interviewer, "she thought that his private touched your back private. Did she get that right or did she get that mixed up?"[80] Z replied that she "got that right," and that his "back private" had been touched by Karpenski's "front private." He said that Karpenski's "private" had been "soft as a worm" at the time; that it had gone "inside"; and that it had "stayed still" rather than moving around.[81] This had occurred during the night, while he was "still asleep," and not just pretending to be asleep.[82] The next morning, he said, he had informed his mother of what had happened.

The other witnesses at trial were MM, Z's maternal grandmother, R, the child interviewer, the doctor who had performed the physical, Z's mental health counselor, and Karpenski. Karpenski testified that he had not abused Z in any way. The mental health counselor said that he had not asked Z about sexual abuse; that he had not heard Z mention sexual abuse; but that he had, during therapy sessions, thought Z could tell the difference between reality and fantasy. The other witnesses testified essentially as set forth above. The grandmother added that Z had lived full-time with her since July 1995; that as a day care worker, she was trained to look for signs of sexual abuse in children; and that she had not seen any such signs with Z.

The jury convicted on both counts. According to Karpenski, he could not qualify for a SSOSA sentence because he

---

[79]*Id.* at 194-95.

[80]*Id.*

[81]*Id.* at 195-96.

[82]*Id.* at 197.

would not relinquish his claim of innocence. The trial court committed him to prison for seven and one half years.[83]

Karpenski makes two major claims on appeal. In the first, he argues that the trial court erred by admitting Z's trial testimony, because Z was incompetent to be a witness. In the second, he argues that the trial court erred by admitting Z's various out-of-court statements, because they were unreliable and thus inadmissible hearsay. We consider each claim separately.

## I. COMPETENCY

As just noted, Karpenski's first claim is that the trial court erred by finding Z competent to testify at trial. We agree.

Every person is competent to be a witness "except as otherwise provided by statute or by court rule."[84] The statutes, rules and cases formulate competency in various ways. One formulation provides that a person "shall not be competent to testify" if he or she "appear[s] incapable of receiving just impressions of the facts, respecting which [he or she is] examined, or of relating [such facts] truly."[85] A second, similar formulation provides that a child shall not be competent to testify if he or she "do[es] not have the capacity of receiving just impressions of the facts about which [he or she is] examined or . . . do[es] not have the

---

[83]The sentence was 90 months on count I and 68 months on count II, to run concurrently.

[84]ER 601. This rule "differs significantly from Federal Rule 601." ER 601 Judicial Council cmt.; *see also* 5C KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE 255 (1999) ("Rule 601 is fundamentally different from the corresponding federal rule."). As a result, federal competency cases are of limited value in Washington.

[85]RCW 5.60.050(2). *See, e.g., In re Dependency of A.E.P.*, 135 Wn.2d 208, 223, 956 P.2d 297 (1998); *Jenkins v. Snohomish County PUD No. 1*, 105 Wn.2d 99, 101, 713 P.2d 79 (1986); *State v. Pham*, 75 Wn. App. 626, 629, 879 P.2d 321 (1994).

capacity of relating [such facts] truly."[86] A third formulation provides that a witness is competent if he or she "has sufficient mental capacity to understand the nature and obligation of an oath," and if he or she possesses " 'sufficient mind and memory to observe, recollect, and narrate the things he has seen or heard.' "[87] A fourth formulation provides that the general test of competency is whether the witness "understands the nature of an oath and is capable of giving a correct account of what he [or she] has seen and heard."[88] A fifth formulation provides that a witness is competent if he or she "ha[s] the ability to understand the underlying events and relate them truthfully in court."[89] A sixth formulation provides:

> The true test of the competency of a young child as a witness consists of the following: (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.[90]

■ Under any of these formulations, the competency of

---

[86]CrR 6.12(c). *See, e.g., State v. Stange,* 53 Wn. App. 638, 641, 769 P.2d 873, *review denied,* 113 Wn.2d 1007 (1989); *State v. Przybylski,* 48 Wn. App. 661, 664, 739 P.2d 1203 (1987).

[87]*State v. Ryan,* 103 Wn.2d 165, 171, 691 P.2d 197 (1984) (quoting *State v. Moorison,* 43 Wn.2d 23, 28-29, 259 P.2d 1105 (1953)); *see also Pham,* 75 Wn. App. at 629.

[88]*State v. Allen,* 67 Wn.2d 238, 241, 406 P.2d 950 (1965); *see also State v. Froehlich,* 96 Wn.2d 301, 635 P.2d 127 (1981); *State v. Pethoud,* 53 Wn.2d 276, 278, 332 P.2d 1092 (1958); *Moorison,* 43 Wn.2d at 27; *State v. Watkins,* 71 Wn. App. 164, 169, 857 P.2d 300 (1993); *State v. Smith,* 30 Wn. App. 251, 254, 633 P.2d 137 (1981), *aff'd,* 97 Wn.2d 801 (1982).

[89]*Watkins,* 71 Wn. App. at 170, n.4; *see also State v. Gitchel,* 41 Wn. App. 820, 824, 706 P.2d 1091 (1985).

[90]*State v. Allen,* 70 Wn.2d 690, 692, 424 P.2d 1021 (1967). *See also, e.g., In re Dependency of A.E.P.,* 135 Wn.2d at 223; *Jenkins v. Snohomish County PUD No. 1,* 105 Wn.2d at 101; *State v. Wyse,* 71 Wn.2d 434, 437, 429 P.2d 121 (1967); *State v. Hunsaker,* 39 Wn. App. 489, 491, 693 P.2d 724 (1984); *State v. Smith,* 30 Wn. App. 251, 253, 633 P.2d 137 (1981).

a witness turns on three basic preliminary questions of fact.[91] One is whether the witness, at the time of his or her in-court statement (i.e., his or her "testimony"), is describing an event that he or she had the capacity to accurately perceive (or, in alternative terms, an event about which he or she could "receive just impressions"). Another is whether the witness, at the time of his or her in-court statement, is describing an event that he or she has the capacity to accurately recall. A third is whether the witness, at the time of his or her in-court statement, is describing an event that he or she has the capacity to accurately relate. The third question subdivides into at least the following: (a) whether the witness has the capacity to understand simple questions about the event; (b) whether the witness has the capacity to express in words his or her memory of the event; (c) whether the witness has the capacity to speak in the formal courtroom setting; (d) whether the witness has the capacity to distinguish truth from falsehood; and (e) whether the witness has the capacity to understand and carry out his or her obligation to speak the truth.[92]

 The dispositive question here is whether Z had the capacity to distinguish truth from falsehood.[93] The trial court necessarily but implicitly resolved that question in favor of the State. We review the trial court's ruling under

---

[91]*See Watkins*, 71 Wn. App. at 170 ("Ordinarily, the competency of a witness is a preliminary fact question to be determined by the trial court."). *See also State v. Leavitt*, 111 Wn.2d 66, 70, 758 P.2d 982 (1988) (ER 104(a), the preliminary fact rule, controls competency hearing); *State v. Jones*, 112 Wn.2d 488, 492, 772 P.2d 496 (1989) (same). Incidentally, none of these three questions involves credibility. Competency is whether a witness *possesses* the capacity to accurately perceive, recall and relate. Credibility is whether a witness is correctly *exercising* the capacity that he or she possesses. The trial judge decides the former; the jury decides the latter.

[92]*See Jenkins v. Snohomish County PUD No. 1*, 105 Wn.2d at 102 (at time of making an out-of-court hearsay statement, later offered at trial to prove its truth, the declarant "understood his obligation to tell the truth"; "knew the difference between truth and falsehood"; "had the mental capacity . . . to understand simple questions"; and "the ability to express his recollection in words").

[93]In focusing on this one question, we do not indicate that the record supports an affirmative answer to the others. It is just that the others need not be addressed.

the so-called "abuse of discretion" standard.[94] We can apply that standard rationally only if we first understand (A) the nature of the trial court's discretion and (B) the nature of our own discretion.[95] Thus, we begin with those matters.

## A.

■ ■ The trial judge decides preliminary questions of fact under ER 104(a).[96] In doing so, he or she does not always exercise the same kind of discretion. When dealing with some preliminary questions, the judge inquires whether the evidence is sufficient to support a finding of the needed fact.[97] When dealing with other such questions, the judge inquires whether the evidence preponderates in favor of the needed fact.[98] The difference is important

Although the concurrence/dissent states that the *only* question concerning Z's competence at trial arises from his apparent inability to distinguish truth from falsity, the record suggests serious doubt concerning *all* aspects of Z's competency, including perception, recollection, and narration. We limit our discussion to Z's ability to distinguish truth from falsity because that is enough to resolve this case. That does not mean, however, that the other aspects of Z's competency are not in question.

[94]*Watkins*, 71 Wn. App. at 170. *See also State v. Avila*, 78 Wn. App. 731, 735, 899 P.2d 11 (1995); *State v. Johnson*, 28 Wn. App. 459, 461, 624 P.2d 213 (1981), *aff'd*, 96 Wn.2d 926 (1982). In some cases, it is stated that an appellate court will reverse only for a "manifest" abuse of discretion. *E.g., State v. Smith*, 97 Wn.2d 801, 803, 650 P.2d 201 (1982); *State v. Pham*, 75 Wn. App. at 629; *Watkins*, 71 Wn. App. at 170. This statement is nonsensical if taken to mean that an appellate court will uphold an abuse of discretion so long as the abuse is not "manifest."

[95]No one can determine whether a trial court exceeded (i.e., abused) its discretion without knowing the nature and boundaries of that discretion. Nor can anyone determine whether an appellate court is entitled to substitute its view for the trial court's view without understanding the nature and boundaries of the appellate court's discretion.

[96]We do not consider whether the trial judge resubmits such questions to the jury. That is a separate question not presented here.

[97]Examples include, but are not limited to, whether evidence is conditionally relevant, ER 104(b); whether a witness has personal knowledge, ER 602; whether tangible evidence is authentic, ER 901; and whether a purported original writing, recording or photograph is in fact that, ER 1008.

[98]Examples include, but are not limited to, most hearsay-related questions of preliminary fact, *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *United States v. Franco*, 874 F.2d 1136, 1139 (7th Cir. 1989); *Condon-Bros., Inc. v. Simpson Timber Co.*, 92 Wn. App. 275, 286-87, 966 P.2d 355

because it controls whether the judge may reject inferences favorable to the proponent; the judge may not when inquiring whether the evidence is sufficient, but the judge may when inquiring whether the evidence preponderates.

One question here, then, is whether a trial judge faced with a competency-related question of preliminary fact inquires (a) whether the evidence is sufficient to support a finding of that fact, or (b) whether the evidence preponderates in favor of that fact. In *State v. Borland*,[99] Division One addressed that question. It stated:

> Although the exercise of the trial judge's discretion must be based on the entire testimony, the court is entitled to select which portions have the greater persuasive value on the ultimate issue. There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness. The trial judge is in a position to assess the body language, the hesitation or lack thereof, the manner of speaking, and all the intangibles that are significant in evaluation but are not reflected in a written record.[100]

These remarks are not consistent with a trial judge's asking whether the evidence is sufficient, for a judge asking that is *not* "entitled to select which portions [of the evidence] have greater persuasive value."[101] These remarks are consistent with a trial judge's asking whether the evidence preponderates, for a judge asking that *is* "entitled to select which portions have the greater persuasive value." Accordingly, we conclude that when a trial judge addresses a competency-related question of preliminary fact, he or

---

(1998); whether the methodology underlying novel scientific evidence is reliable enough for admission, *Daubert v. Merrell Dow*, 509 U.S. 579, 592 n.10, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and most privilege-related questions of preliminary fact. *See* ER 104(a); *United States v. Zolin*, 491 U.S. 554, 566, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989).

[99]57 Wn. App. 7, 786 P.2d 810, *review denied*, 114 Wn.2d 1026 (1990).

[100]*Borland*, 57 Wn. App. at 10-11.

[101]Another way of stating the same idea is to say that a judge determining whether the evidence is sufficient may not reject evidence or inferences favorable to the proponent.

she has discretion to inquire whether the evidence preponderates in favor of that fact.

## B.

▮▮ To identify the nature of the trial court's discretion is not, of course, to identify the nature of our own discretion on appeal. When a trial judge's function is to decide whether the evidence is sufficient to support a finding, a reviewing court's function will be the same.[102] When a trial judge's function is to decide whether the evidence preponderates, a reviewing court's function may or may not be the same. If the reviewing court's information is as good or better than the trial court's, the reviewing court will sometimes be permitted to substitute its own view, without deference to the trial court[103]; but if the reviewing court's information is not as good as the trial court's, the reviewing court will limit itself to deciding whether the evidence is sufficient to support what the trial court did.[104]

Another question here, then, is whether an appellate

[102]The reason a trial court is charged with determining sufficiency is so that it will not encroach on the fact-finding function of the jury. If the trial court should not encroach, the appellate court should not either. Thus, when the trial court is limited to deciding sufficiency, the appellate court should be also. Perhaps the most common example of this reasoning is the summary judgment process, where both trial and appellate courts perform the same function—deciding sufficiency. *See, e.g., Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 226, 770 P.2d 182 (1989); *Hontz v. State*, 105 Wn.2d 302, 311, 714 P.2d 1176 (1986).

[103]Information equal to trial court's: *Jenkins*, 105 Wn.2d at 102 (appellate court reviewed competency de novo—without deference—where trial court's decision was based wholly on documents, and appellate court had all the documents before it). Information superior to trial court's: *State v. Jones*, 130 Wn.2d 302, 307, 922 P.2d 806 (1996); *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993) (appellate court reviews de novo—without deference—trial court's determination that scientific process is or is not generally accepted in the scientific community; appellate court may use scientific literature and other appropriate information, whether or not in the trial court record). *See also State v. Fenney*, 448 N.W.2d 54, 58 (Minn. 1989) (question of whether electrophoretic testing of dried bloodstains meets *Frye* test is one of law and is reviewed de novo, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)); *Commonwealth v. Lykus*, 367 Mass. 191, 198, 327 N.E.2d 671, 675 (1975) (appellate court examined decisions from other jurisdictions and scientific journals as well as trial evidence).

[104]*Allen*, 70 Wn.2d at 692 (determination of matters not reflected in the written record are within trial judge's discretion); *State v. Sardinia*, 42 Wn. App. 533, 537, 713 P.2d 122 (1986) ("Because the trial judge witnessed the child's manner

court reviewing a competency-related preliminary question of fact inquires whether the evidence is sufficient to support the ruling, or whether the evidence preponderates in favor of the ruling. If the trial judge's basis was entirely documentary, and the documents appear in the appellate record, the appellate court's information is as good as the trial court's, and the appellate court may substitute its own view of competency without deferring to the trial court's ruling.[105] But if the trial court saw and evaluated the witness in person, its information is better than the appellate court's, and the appellate court will limit itself to determining whether the evidence is sufficient to support the trial court's ruling.[106] Regarding this last proposition, the Supreme Court recently said:

> The determination of competency rests primarily with the trial judge who sees the witness, notices his manner, and considers his capacity and intelligence. These are matters that are not reflected in the written record for appellate review. Their determination lies within the sound discretion of the trial judge and will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion.[107]

Finally, then, we come to the precise question posed by the so-called "abuse of discretion" standard: Taking the record in the light most favorable to the State, could a trial judge

---

and heard her answers, he is in a better position than we are to make the determination of her competency.").

[105]*Jenkins*, 105 Wn.2d at 103.

[106]The reviewing court may also examine whether the trial court understood the law, but that proposition does not seem to be in issue here.

[107]*State v. Swan*, 114 Wn.2d 613, 645, 790 P.2d 610 (1990). *See also Allen*, 70 Wn.2d at 692 (determination of matters not reflected in the written record are within trial judge's discretion); *State v. Collier*, 23 Wn.2d 678, 684, 162 P.2d 267 (1945) (quoting from 28 Ruling Case Law 465, § 53); *State v. Sardinia*, 42 Wn. App. at 537 ("Because the trial judge witnessed the child's manner and heard her answers, he is in a better position than we are to make the determination of her competency."); *State v. Justiniano*, 48 Wn. App. 572, 578, 740 P.2d 872 (1987); *State v. Przybylski*, 48 Wn. App. at 665.

reasonably find it to be more likely true than not true that Z was capable of distinguishing truth from falsity?

## C.

The answer is no. At the outset of the competency hearing, Z took the oath and solemnly "promised to tell the truth about everything that happened."[108] He also promised *not* to "make up any stories."[109] Moments later, he was describing in vivid detail how he and his younger brother had been born at the same time. As the State notes on appeal, "This is impossible because Z is seven and his little brother is two."[110] As the trial court noted, this is "impossible" because it is "beyond understanding" that Z was in the room when his little brother was born.[111] No one suggests that Z was intentionally lying; it seems that he actually believed what he was saying, and that he was merely manifesting his long-standing, often-observed inability to distinguish what was true from what was not. The trial court expressly found that Z was "testify[ing] as to an event that he could not possibly have recalled"; that he was "confused" regarding "dream versus reality"; and that he was "not old enough to be able to separate that confusion." Inexplicably, however, it then concluded that Z was competent to testify. It is our opinion that the *only* reasonable view of this record is the one expressed by the trial court—that Z lacked the capacity to distinguish truth from falsehood. Accordingly, we hold that the evidence is insufficient to support a finding that Z was capable of distinguishing truth from falsity, and that Z was incompetent to testify.

## II. HEARSAY

Karpenski's second claim is that Z's hearsay statements

---

[108]Report of Proceedings at 17 (Oct. 17, 1996).

[109]*Id.*

[110]Br. of Resp't at 14.

[111]Report of Proceedings at 31 (Oct. 17, 1996).

to the twins' father in July 1995, to the child interviewer on November 14, 1995, and to the deputy prosecutor on October 8, 1996 were inadmissible under RCW 9A.44.120[112] and the federal confrontation clause. This is true, he contends, because "Z's incompetence renders his hearsay statements unreliable,"[113] and because the so-called *Ryan* factors were not shown by the State. To understand these contentions, we must first understand hearsay exceptions in general.

Under the rules of evidence and the federal confrontation clause, the proponent who wants to admit a hearsay statement must show "sufficient indicia of reliability."[114] The proponent may derive such indicia from the totality of circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief,"[115] including the contents of the statement

---

[112]RCW 9A.44.120 provides:

A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, . . . not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings . . . in the courts of the state of Washington if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or

(b) Is unavailable as a witness: PROVIDED, That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

[113]Br. of Appellant at 37.

[114]*Idaho v. Wright*, 497 U.S. 805, 815, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); *State v. Whelchel*, 115 Wn.2d 708, 715, 801 P.2d 948 (1990); *State v. Ryan*, 103 Wn.2d 165, 174, 691 P.2d 197 (1984); *see* ER 801-05.

[115]*Wright*, 497 U.S. at 819. Similarly, the Washington Supreme Court has said for purposes of RCW 9A.44.120:

Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out-of-court statement, and not from subsequent corroboration of the criminal act. "The circumstantial guaranties

itself.[116] The proponent may not derive such indicia from circumstances that were not in existence at the time and place of the making of the statement, for that would allow an unreliable hearsay statement to be admitted merely "by bootstrapping on the trustworthiness of other evidence at trial."[117] In short, the proponent must produce not only the hearsay statement itself, but also indicia of reliability that show, *as of the time the statement was made*, its probable reliability.

 Every hearsay exception recognized by the law of evidence describes circumstances thought to indicate, *in part*, that a hearsay statement probably was reliable when made.[118] The description may be specific[119] or general,[120] but it invariably involves circumstances that surround the mak-

---

of trustworthiness on which the various specific exceptions to the hearsay rule are based are those that existed at the time the statement was made and do not include those that may be added by using hindsight."

*Ryan*, 103 Wn.2d at 174 (quoting *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir. 1979)). Interestingly, the *Wright* Court cited and relied on *Ryan*. *Wright*, 497 U.S. at 821.

[116]*State v. Doe*, 105 Wn.2d 889, 896, 719 P.2d 554 (1986); *see also Bourjaily v. United States*, 483 U.S. 171, 178-79, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

[117]*Wright*, 497 U.S. at 823; *Ryan*, 103 Wn.2d at 174; *State v. Frey*, 43 Wn. App. 605, 611 n.9, 718 P.2d 846 (1986).

[118]*Ryan*, 103 Wn.2d at 174 (quoting *Huff v. White Motor Corp.*, 609 F.2d at 292 ("The circumstantial guarantees of trustworthiness on which the various specific exceptions to the hearsay rule are based are those that existed at the time the statement was made and do not include those that may be added by using hindsight.")); *Wright*, 497 U.S. at 820 (same); *see, e.g.*, ER 803-04. Whether the described circumstances exist in a given case is a hearsay-related preliminary question of fact. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *United States v. Franco*, 874 F.2d 1136, 1139 (7th Cir. 1989); *Condon Bros., Inc. v. Simpson Timber Co.*, 92 Wn. App. 275, 286-87, 966 P.2d 355 (1998).

[119]ER 803(2), for example, requires "the stress of excitement."

[120]In Washington, for example, RCW 9A.44.120 requires "sufficient indicia of reliability." In the federal system, FED. R. EVID. (FRE) 807 (not adopted in Washington) similarly requires "circumstantial guarantees of trustworthiness." The federal confrontation clause does not prohibit these generalized provisions. *Wright*, 497 U.S. at 820-21; *Ryan*, 103 Wn.2d at 170; *State v. Griffith*, 45 Wn. App. 728, 737, 727 P.2d 247 (1986).

ing of the statement.[121] If the description is general, the courts may try to make it more specific by listing circumstances thought to bear on reliability. For example, RCW 9A.44.120 states only "that the time, content, and circumstances of the statement provide sufficient indicia of reliability."[122] So, in *State v. Ryan*,[123] the Washington Supreme Court held that when a trial court is applying RCW 9A.44.120, it should consider nine specific circumstances: (1) whether the child had a motive to lie; (2) the child's general character for veracity; (3) whether more than one person heard the child's statements[124]; (4) whether the child's statements were made spontaneously; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contains an express assertion of past fact[125]; (7) whether cross examina-

---

[121]See, for example, the exceptions codified in ER 803-04.

[122]*See also Ryan*, 103 Wn.2d at 177. We note in passing that this part of RCW 9A.44.120 *is* mandated by the federal confrontation clause. *Wright*, 497 U.S. at 821 ("[U]nless an affirmative reason, arising from the circumstances under which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement.").

[123]103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

[124]The function of any hearsay exception is to require the proponent to produce circumstances demonstrating that the declarant's hearsay statement is probably *true* (i.e., reliable), thereby supplanting the need to cross-examine the declarant. This third factor supports a finding that the declarant's hearsay statement was *made*, but it says little or nothing about whether the declarant's hearsay statement was *true*. Its significance to the existence of indicia of reliability is minor at best.

[125]This sixth factor is drawn from *Dutton v. Evans*, 400 U.S. 74, 88, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970). In that case, A and B were charged with murder, but A was tried separately. At trial, the State offered B's statement to his cellmate, "If it weren't for A, I wouldn't be in this now." The Supreme Court reasoned that if B were intending to implicate A falsely, he would have expressly asserted, "A did it," rather than stating obliquely, "If it weren't for A, I wouldn't be in this now." Thus, the Court felt, the absence of an express assertion of past fact tended to show that B's statement was reliable when made. This idea is of little use when applying RCW 9A.44.120, for most statements offered under that statute *are* express assertions of past fact. *See State v. Leavitt*, 111 Wn.2d 66, 75, 758 P.2d 982 (1988); *In re Dependency of S.S.*, 61 Wn. App. 488, 498, 814 P.2d 204 (1991); *State v. Borland*, 57 Wn. App. 7, 17, 786 P.2d 810, *review denied*, 114 Wn.2d 1026 (1990); *State v. Stange*, 53 Wn. App. 638, 644-47, 769 P.2d 873, *review denied*, 113 Wn.2d 1007 (1989). It demonstrates, however, that the contents of a

tion could show the declarant's lack of knowledge[126]; (8) whether the possibility of the declarant's faulty recollection is remote[127]; and (9) whether the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented the defendant's involvement.[128] Each of these circumstances is both non-

---

hearsay statement may be used when assessing a statement's reliability (a process sometimes called "bootstrapping"). *See Bourjaily*, 483 U.S. at 178; *Doe*, 105 Wn.2d at 896.

[126]Although this seventh factor also originated in *Dutton*, it was later disapproved by the United States Supreme Court. Because it does not surround the time and place of the making of the statement, it may not be used to show that the declarant's hearsay statement is reliable. *Wright*, 497 U.S. at 819, 823 (having held that particularized guarantees of trustworthiness "must be shown from the totality of circumstances . . . that surround the making of the statement," the Court said that "although a plurality of the Court in *Dutton v. Evans* looked to corroborating evidence as one of four factors in determining whether a particular hearsay statement possessed sufficient indicia of reliability, we think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy"); *see also Borland*, 57 Wn. App. at 18-19 ("overwhelming evidence" extrinsic to the making of the declarant's statement led the *Dutton* Court to say that cross-examination could not show declarant's lack of knowledge); *Leavitt*, 111 Wn.2d at 75; *Dependency of S.S.*, 61 Wn. App. at 498.

[127]This eighth factor also originated in *Dutton*. Insofar as it implicates circumstances not surrounding the hearsay statement, its use as a factor bearing on reliability has since been disapproved. *Wright*, 497 U.S. at 819, 823. Perhaps more importantly, it seems to be an alternative formulation of the conclusion to be reached, as opposed to a reason for reaching the conclusion; to say that a statement is not affected by faulty perception, recollection, or narration is simply to assert, using negative language, that the statement is reliable. *See Dependency of S.S.*, 61 Wn. App. at 499. And, if this eighth factor is proper at all, it duplicates a concern "already embraced within the fifth *Parris* factor [*State v. Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982)]: 'the timing of the declaration.' " *Borland*, 57 Wn. App. at 19; *see also State v. Swan*, 114 Wn.2d 613, 651, 790 P.2d 610 (1990); *Leavitt*, 111 Wn.2d at 75.

[128]This ninth factor is also drawn from *Dutton*. If it means that an *absence* of circumstances can be a factor supporting reliability, it has been disapproved by *Wright*, 497 U.S. at 821 ("unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement."). If it means that the *presence* of certain circumstances can be a factor supporting reliability, the circumstances the *Dutton* Court was referring to were whether the declarant's statement was spontaneous and against penal interest. *Borland*, 57 Wn. App. at 19. Whether a statement is spontaneous is covered by the fourth factor, and whether a statement is against penal interest is almost always immaterial when applying RCW 9A.44.120. *Borland*, 57 Wn. App. at 19 ("a child's out-of-

exclusive[129] and nonessential.[130] Several are of doubtful validity,[131] but that is not important for purposes of this case; with or without them, we would reach the same result here.

Whether specific or general, the indicia of reliability that appear on the face of a hearsay exemption or exception are rarely "sufficient" by themselves. As a general rule, such indicia must be accompanied by a showing that the declarant had personal knowledge when the statement was made, and, at least when the declarant is a young child not shown to be competent at trial, by a showing that the declarant was competent when the statement was made.[132] We turn, then, to personal knowledge and competence in the context of hearsay.

Even though a hearsay statement satisfies the criteria set forth on the face of a hearsay exemption or exception, it cannot be reliable if, at the time it was made, the declarant spoke or wrote without personal knowledge. Generally, then, the proponent must show that the circumstances surrounding the statement, coupled with the contents of the

---

court statement recounting sexual abuse will never be against the child's penal interest"). *See also Dependency of S.S.*, 61 Wn. App. at 499.

[129]*Ryan*, 103 Wn.2d at 176; *see also Wright*, 497 U.S. at 820 (requiring that the totality of circumstances demonstrate "particularized guarantees of trustworthiness"); *In re Dependency of A.E.P.*, 135 Wn.2d 208, 230, 956 P.2d 297 (1998).

[130]*Swan*, 114 Wn.2d at 652; *Borland*, 57 Wn. App. at 20.

[131]See the seven preceding footnotes. *See also In re Dependency of A.E.P.*, 135 Wn.2d at 230-31 ("We recognize some of the *Ryan* factors have subsequently been criticized as being unhelpful in determining reliability."); *Dependency of S.S.*, 61 Wn. App. at 497-99 (criticizing all four *Dutton* factors as either unhelpful or encompassed in *Parris* factors); *Borland*, 57 Wn. App. at 16-20 (*Dutton* factors are not useful in determining which statements are admissible under RCW 9A.44.120); *State v. Henderson*, 48 Wn. App. 543, 551 n.5, 740 P.2d 329 (1987) (*Dutton* factors not very helpful in assessing the reliability of child hearsay statements in most sexual abuse cases); *Frey*, 43 Wn. App. at 611 (*Dutton* factors do not indicate reliability "as firmly as" *Parris* factors).

[132]The language "not shown to be competent at trial" is taken from *Jenkins v. Snohomish County PUD No. 1*, 105 Wn.2d 99, 100, 713 P.2d 79 (1986). *See also Ryan*, 103 Wn.2d at 174 (where trial court did not determine whether children were competent to testify at trial, it was required to "determine whether the children were competent when they made the statements").

statement itself, give rise to an inference of personal knowledge.[133]

Even though a hearsay statement falls within a hearsay exemption or exception, it cannot be reliable if, when it was made, the declarant was incompetent.[134] The competency of most declarants will not be in issue, just as the competency of most trial witnesses is not in issue. But when the competency of a declarant is in issue—as, for example, when a young child is not shown to be competent at trial and the opponent voices a proper objection to the child's pretrial hearsay statement—the proponent must demonstrate not only circumstances described on the face of a hearsay exception, but also circumstances showing that at the time of the hearsay statement the child was describing an event that the child had the capacity to accurately perceive; to accurately recall; and to accurately relate. It matters little whether these capacity-related circumstances

---

[133]*Beck v. Dye*, 200 Wash. 1, 9-10, 92 P.2d 1113, 127 A.L.R. 1022 (1939); Advisory Committee's Note to FRE 803, 56 F.R.D. 183, 303 ("In a hearsay situation, the declarant is, of course, a witness, and neither this rule [FRE 803] nor Rule 804 [FRE 804] dispenses with the requirement of firsthand knowledge."); Advisory Committee's Note to FRE 104, 56 F.R.D. 183, 197 (quoting CHARLES T. MC-CORMICK, LAW OF EVIDENCE, § 10, at 19 (1954) ("In the case of hearsay, it is enough, if the declarant 'so far as appears [has] had an opportunity to observe the fact declared.' ")); ER 602, second sentence. For specific reasons not pertinent here, a very small number of hearsay exceptions do not require personal knowledge. *E.g.*, ER 801(d)(2)(i); ER 801(d)(2)(iii); ER 803(22); FRE 803(8)(c) (not adopted in Washington); *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 258, 744 P.2d 605 (1987); *Janus v. Akstin*, 91 N.H. 373, 20 A.2d 552 (1941).

[134]*Jenkins*, 105 Wn.2d at 101-03; *Ryan*, 103 Wn.2d at 173-74; *State v. Justiniano*, 48 Wn. App. 572, 578, 740 P.2d 872 (1987) ("We conclude that the inability of a child witness to testify at trial does not render inadmissible the child's earlier out-of-court statement so long as the child was then competent to make such statement and the other requirements of RCW 9A.44.120 have been satisfied."); *see also Dependency of S.S.*, 61 Wn. App. at 495 ("The *Gribble* court observed that the Washington State Supreme Court, in *State v. Ryan*, . . . noted that the child hearsay declarant must be shown to be competent at the time the statements are made."); *State v. Gribble*, 60 Wn. App. 374, 382, 804 P.2d 634 (1991) ("In *State v. Ryan*, the court said the child must be shown to be competent at the time the hearsay statements are made" (citation omitted)); *State v. Jackson*, 46 Wn. App. 360, 368 n.6, 730 P.2d 1361 (1986) ("On retrial, the trial court must determine the child's competency to be a witness at trial and her competency at the time the statements were made."); *Frey*, 43 Wn. App. at 611 n.9.

are called "elements of competency," "competency-related preliminary facts," "indicia of reliability," or "particularized guarantees of trustworthiness." If any one of them is missing, the child's hearsay statement cannot be reliable.

At least twice, the Washington Supreme Court has held that the hearsay statement of a young child not shown to be competent at trial cannot be reliable if the record fails to show that the declarant was competent when the hearsay statement was made. In the first case, *Jenkins v. Snohomish County PUD No. 1*,[135] Jonathan Jenkins, age seven, was injured by electricity after he and a friend, Lance Sinka, age six, climbed over the fence of a power substation. In deposition a year later, Lance gave a bizarre and inconsistent account of what he and Jonathan had done—so bizarre and inconsistent as to demonstrate that he "did not [then] have a memory sufficient to retain an independent recollection of the occurrence."[136] When trial convened, Lance was unavailable to give in-court testimony, and the trial court admitted the deposition over the plaintiffs' objection. On appeal, however, the Supreme Court reversed. Even though the deposition met the facial requirements of the hearsay exception usually used for nonparty depositions,[137] Lance had lacked, at the time of the deposition, the capacity to accurately recall the events at issue in the case.

In the second case, *State v. Ryan*,[138] two young children made hearsay statements alleging sexual abuse by the de-

---

[135]105 Wn.2d 99, 100, 713 P.2d 79 (1986).

[136]*Jenkins*, 105 Wn.2d at 102.

[137]ER 804(b)(1) is the hearsay exception for nonparty depositions offered for hearsay use. It provides on its face that a deposition will not be excluded as hearsay if the declarant is unavailable to testify at trial and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony . . . ." The defendant in *Jenkins* offered Lance's nonparty deposition to prove the truth of the matters asserted therein; thus, the deposition was hearsay and ER 804(b)(1) came into play. The opinion states that Lance was unavailable to testify at trial. The opinion does not state that the plaintiffs had an opportunity and similar motive to examine, but it seems obvious that they did—*if* Lance was competent at the time of the deposition. We infer, then, that Lance's deposition met the facial requirements of ER 804(b)(1).

[138]103 Wn.2d 165, 173, 691 P.2d 197 (1984).

fendant. Neither testified at trial, and neither was shown to be competent at trial. Although the trial court admitted the statements, the Supreme Court reversed for failure to determine the declarants' competency at the time the statements were made. The court said (with our interpretations in brackets):

> The declarant's competency [at the time of his or her hearsay statement] is a precondition to admission of his hearsay statements as are other testimonial qualifications [apparently referring to personal knowledge].
>
> The hearsay rule is merely an additional test or safeguard to be applied to testimonial evidence otherwise admissible. The admission of hearsay statements, by way of exception to the rule, therefore presupposes that the assertor possessed the *qualifications of a witness* . . . in regard to knowledge and the like.

(Footnote omitted.) 5 J. WIGMORE, EVIDENCE § 1424, at 255 (rev. 1974).

> If the declarant was not competent at the time of making the statements, the statements may not be introduced through hearsay repetition.[139]

Furthermore, the court applied its holding by saying:

> The trial court did not determine whether the children were competent when they made the statements. If they were not, their statements must be excluded as being unreliable.[140]

The court then remanded for further proceedings.[141]

In a third case, *State v. Hunt*,[142] Division One recognized the concepts found in *Ryan* and *Jenkins*, but did not fully apply them due to an inadequate challenge below. It said:

---

[139]*Ryan*, 103 Wn.2d at 173.

[140]*Ryan*, 103 Wn.2d at 174.

[141]*See also State v. Jackson*, 46 Wn. App. at 368 n.6 ("On retrial, the trial court must determine the child's competency to be a witness at trial and her competency at the time the statements were made."); *Frey*, 43 Wn. App. at 611 n.9.

[142]48 Wn. App. 840, 741 P.2d 566 (1987).

The circumstantial guaranties of trustworthiness generally used to analyze the reliability of hearsay statements presuppose, in most instances, that the hearsay declarant possessed a certain degree of mental capacity throughout the relevant time period. If the requisite mental capacity is lacking, the time, manner, and circumstances of the making of the statement may well be irrelevant to a determination of reliability . . . . Here, however, S's mental capacity to receive accurate impressions of the occurrence and to relate them accurately at the time of the statement was never challenged below; nor do we find any evidence in the record to support such a challenge.[143]

Neither *Jenkins* nor *Ryan* injected anything new or startling into the law of evidence. As the *Ryan* court noted, Wigmore said long ago:

The hearsay rule is merely an additional test or safeguard to be applied to testimonial evidence otherwise admissible. The admission of hearsay statements, by way of exception to the rule, therefore presupposes that the assertor possessed the *qualifications of a witness* . . . in regard to knowledge and the like.[144]

Similarly, the Advisory Committee for the Federal Rules of Evidence has said, "In a hearsay situation, the declarant is, of course, a witness, and neither [Rule 803] nor Rule 804 dispenses with the requirement of firsthand knowledge."[145] The underlying ideas are that the judge should not forward to the jury any statement the jury could not rationally use,

---

[143]*Hunt*, 48 Wn. App. at 844-45 (citation omitted).

[144]*Ryan* at 173 (quoting 5 JOHN HENRY WIGMORE, EVIDENCE § 1424, at 255 (James H. Chadbourn ed., 1974)).

[145]Advisory Committee's Note to FRE 803, 56 F.R.D. 183, 303; *see also* Advisory Committee's Note to FRE 806, 56 F.R.D. 183, 329 ("The declarant of a hearsay statement which is admitted in evidence is in effect a witness"); Advisory Committee's Note to FRE 104, 56 F.R.D. 183, 197 (quoting McCORMICK, § 10, at 19 ("In the case of hearsay, it is enough, if the declarant 'so far as appears [has] had an opportunity to observe the fact declared.' ")). The hearsay declarant is a witness because his or her out-of-court statement is offered for the same purpose as an in-court witness' in-court statement: to prove the truth of the matter asserted. It is because the declarant is a witness that ER 806 exists. Rules 803 and 804 catalogue most of the hearsay exceptions.

and that the jury could not rationally use the statement of a declarant who spoke without personal knowledge or while incompetent—regardless of whether the declarant was excited, speaking in a deposition, or within some other hearsay exception.[146]

Nothing we have said means that the hearsay statement of a young child is inadmissible merely because the child is incompetent to testify at trial.[147] A young child who lacks the capacity to remember from the time of event to the time of trial (often a period of months or years) may nonetheless have had the capacity to remember from the time of event to the time of his or her hearsay statement (often a period of minutes or hours).[148] A young child who lacks the capacity to relate the event in the formal courtroom setting may nonetheless have had the capacity to relate the event in an informal hearsay setting.[149] But a young child who lacks at trial the capacity to distinguish truth from falsehood probably also lacked that capacity when, at an even younger age, he or she made a hearsay statement; and a child who lacked the capacity to perceive the event when it occurred cannot later make a reliable statement about it, whether in court or outside of court. In short, the effect of incompetence at trial upon the reliability of a

---

[146]*See Beck v. Dye*, 200 Wash. at 9-10.

[147]*Swan*, 114 Wn.2d at 648, 652; *Doe*, 105 Wn.2d at 896; *Dependency of S.S.*, 61 Wn. App. at 495; *Gribble*, 60 Wn. App. at 381-82; *Hunt*, 48 Wn. App. at 845 ("We therefore believe that a determination of incompetency [at trial] would not necessarily make the [hearsay] statements unreliable."); *Przybylski*, 48 Wn. App. at 664; *Justiniano*, 48 Wn. App. at 578 ("We conclude that the inability of a child witness to testify at trial does not render inadmissible the child's earlier out-of-court statement so long as the child was then competent to make such statement and the other requirements of RCW 9A.44.120 have been satisfied."); *Griffith*, 45 Wn. App. at 733; *Frey*, 43 Wn. App. at 611 n.9.

[148]*Dependency of S.S.*, 61 Wn. App. at 493; *Hunt*, 48 Wn. App. at 846.

[149]*Swan*, 114 Wn.2d at 647, 652; *Justiniano*, 48 Wn. App. at 574 ("even though the child witness in a courtroom setting is unable to express in words the memory of the occurrence, and is thus unable to testify at trial, the child nevertheless may be found to have been competent when she made a previous out-of-court statement if, on a proper showing, the court is satisfied that the child is capable of receiving just impressions of the facts under inquiry and relating them truly").

hearsay statement varies according to *the reason* for the incompetence at trial.

Nothing we have said means that a proponent must *always* show, before admitting a child's hearsay statement, that the child was competent at the time of that statement. The only case we consider is that in which the child is not shown to be competent at trial. We do not consider any other kind of case, including that in which the child is properly found competent to testify at trial,[150] and that in which the child's trial testimony or hearsay statement is admitted without a specific objection from the opponent.[151]

Nothing we have said requires a trial judge to make inquiries more difficult than those he or she normally makes. To decide whether a declarant meets the terms of any hearsay exception—for example, whether the declarant had a motive to lie or good general character for purposes of RCW 9A.44.120, or whether the declarant was excited for purposes of ER 803(2), or whether the declarant was an agent for purposes of ER 801(d)(2)(iii), or whether the declarant acted under a business duty for purposes of RCW 5.45.020—the judge must examine the circumstances surrounding the hearsay statement. To decide whether a declarant was describing an event that he or she had the capacity to perceive, recall, and relate, the judge likewise must examine the circumstances surrounding the hearsay statement.[152] In examining such circumstances, the judge is not bound by the rules of evidence, except those with re-

---

[150]Arguably, a determination of competence at trial may mean that the child also was competent, or at least probably competent, at the time of the hearsay statement. If a child had the capacity to accurately perceive, he had that capacity for both trial and hearsay purposes. If a child has the capacity to remember at trial, and to relate at trial, he probably had those same capacities at the time of the earlier hearsay statement.

[151]Arguably, a failure to object waives the right to object.

[152]We do not overlook *State v. Hunt*, 48 Wn. App. 840, 741 P.2d 566 (1987), in which Division One "question[ed] whether the trial court could, in many cases, determine in any meaningful sense the declarant's testimonial competence at the time of the statement." *Hunt*, 48 Wn. App. at 846. We confidently answer yes, for the reason given in the text—the trial court routinely and fairly resolves a host of similar hearsay-related questions of preliminary fact. *See* ER 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *United*

spect to privileges, so he or she has broad discretion to require or dispense with live witnesses, to use affidavits and other documents, to take into account the oral representations of counsel, and to employ any other procedure appropriate to the case.[153]

Although most Washington cases are in accord with what we have said, two Court of Appeals' cases warrant further attention. They are *State v. Gribble*[154] and *Dependency of S.S.*[155] For several reasons, we find them unpersuasive.

First, *Gribble* and *S.S.* contravene *Ryan*. Each expressly noted *Ryan*'s holding "that the child hearsay declarant must be shown to be competent at the time the [hearsay] statements are made."[156] Each then concluded the exact opposite: "that a finding of reliability through use of the *Ryan* factors is sufficient assurance of trustworthiness to make unnecessary an inquiry into testimonial competence at the time the hearsay statements are made."[157] This conclusion defies *Ryan* itself, for *Ryan* held that a trial court must consider *both* the *Ryan* factors and the declarant's compe-

---

*States v. Franco*, 874 F.2d 1136, 1139 (7th Cir. 1989); *Condon Bros., Inc. v. Simpson Timber Co.*, 92 Wn. App. 275, 286-87, 966 P.2d 355 (1998).

[153]ER 104(a). That rule provides:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the Rules of Evidence except those with respect to privileges.

As to a declarant's personal knowledge, see ER 602.

[154]60 Wn. App. 374, 804 P.2d 634 (1991).

[155]61 Wn. App. 488, 814 P.2d 204 (1991).

[156]*Dependency of S.S.*, 61 Wn. App. at 495; *see also Gribble*, 60 Wn. App. at 382.

[157]*Gribble*, 60 Wn. App. at 383; *see also Gribble*, 60 Wn. App. at 382 ("we hold that once the trial court has found sufficient indicia of reliability to make the hearsay statements admissible, it is not necessary to also make a finding of testimonial competence at the time the statements are made"); *Dependency of S.S.*, 61 Wn. App. at 495 (*Gribble* and *Hunt* "rejected the notion that the trial court, after finding sufficient indicia of reliability of the child hearsay statements, must also make a separate finding of testimonial competency.") How, we inquire, can a court find that a child's hearsay statement was reliable without considering whether the child was competent at the time?

tence at the time of the statement. It also ignores the sketchy and incomplete nature of the *Ryan* factors, effectively transmuting them from flawed aids into a kind of mantra or chant. As *Ryan* itself makes clear, the *Ryan* factors were never intended to be exclusive, and they do not relieve a trial court of its duty to consider *all* factors that bear on reliability at the time of the statement, including but not limited to the declarant's ability to perceive, recall, and relate.

Second, *Gribble* and *S.S.* misunderstood the fundamental nature of most hearsay exceptions, including RCW 9A.44.120. After noting the *Ryan* court's holding "that the child hearsay declarant must be shown to be competent at the time the statements are made," *Gribble* and *S.S.* observe "[t]here is no such requirement in the child hearsay statute,"[158] and use that as a reason not to follow *Ryan*. Because the hearsay declarant is in effect a witness, however,[159] most hearsay exceptions require exactly what *Ryan* held: that a hearsay statement cannot be reliable enough for admission unless the declarant possessed the qualifications of a witness at the time the statement was made.[160]

Third, *Gribble* and *S.S.* misconstrued the holding of *State v. Doe.*[161] According to *Gribble* and *S.S.*, the *Doe* court held that once a trial court has applied the *Ryan* factors, it need not consider additional factors that bear on whether the declarant was competent at the time of the hearsay statement.[162] In actuality, the *Doe* court held only that a trial court would not be relieved of its duty to consider whether a hearsay statement was reliable, merely because the declarant was incompetent to testify *at trial*. The *Doe* court

---

[158]*Dependency of S.S.*, 61 Wn. App. at 495; *Gribble*, 60 Wn. App. at 382.

[159]As noted above, the statement of a hearsay declarant is offered to prove the truth of the matter asserted. So also is the statement of an in-court witness. In effect, then, the declarant is a witness.

[160]*See, e.g., Beck v. Dye*, 200 Wash. at 9-10.

[161]105 Wn.2d 889, 719 P.2d 554 (1986).

[162]*Dependency of S.S.*, 61 Wn. App. at 495; *Gribble*, 60 Wn. App. at 382.

did not address the factors that a trial court should examine when discharging that duty.

With these principles in mind, we turn to the facts of this case. At the time of the trial, as discussed in section I, Z lacked the capacity to distinguish truth from falsehood. At the time of his hearsay statements, he was younger and less mature than he was at the time of trial. Thus, the *only* reasonable inference available from this record is that Z's lack of capacity at trial also existed when he made his various hearsay statements.[163]

We confirm this logic by examining Z's various statements, and using them as a basis from which to infer his level of mental functioning at the time he made each particular statement.[164] When Z spoke to the twins' father, he denied any improper activity, then blamed it on the twins, then alleged that Karpenski "comes in the middle of the night and tears my clothes off." When Z spoke to the child interviewer, he made *eleven* responses that did not implicate Karpenski before making one that did; and in elaborating on the one that did, he said he had not been fondled by Karpenski's hands. When he spoke to his grandmother, he said that Karpenski had not hurt him or been mean to

---

[163]Although the concurrence/dissent agrees that Z lacked the ability to distinguish truth from falsity at trial, it asserts that Z's lack of ability may have been due to a cause other than youth and immaturity—for example, the courtroom setting or transient emotional turmoil. It is undisputed, however, that Z made false statements, some of them elaborate, on many occasions spanning the entire period at issue here—for example, to his mother at home; to his grandmother at home; to his first grade teacher in school; to the twins' father either before or when he implicated Karpenski; to the child interviewer at the courthouse; and to the deputy prosecutor at the courthouse. These facts will not support an inference that Z's inability was due to the courtroom setting. Nor will they support an inference that Z's inability to tell the truth was due to mental illness or some other cause that was merely transient. The remaining inference is the one in the text: that Z's inability to distinguish truth from falsity was a result of his youth and immaturity (in other words, that he was so young he had not yet learned what it was to tell the truth).

[164]*See Wright*, 497 U.S. at 821, which notes that "consistent repetition" is a factor surrounding the time and place of the making of a particular hearsay statement. The reasoning, apparently, is that a comparison of the various statements made by a declarant often will shed light on his or her mental functioning at the time of a particular statement. *Cf. State v. Williams*, 79 Wn. App. 21, 26, 902 P.2d 1258 (1995).

him, and that Karpenski had put red pepper in his ear. When he spoke to the prosecutor, he said in essence that Karpenski had fondled him on his "front private." When the interviewer stepped in and brought him back to the subject of anal rape, he said that Karpenski had engaged in that act with a coat hanger that felt cold. When he spoke under oath at the competency hearing, he made ludicrous statements about his brother's birth. When he spoke under oath at trial, he said that Karpenski's "front private" touched his "front private," and that when Karpenski's "front private" had touched his "back private," Karpenski's "front private" had penetrated his anus while "soft as a worm." These and other impossibilities, together with the unrefuted testimony of his mother and grandmother, clearly show a boy who lacked the capacity to distinguish truth from falsehood at the time of his various hearsay statements. Accordingly, those statements could not be reliable, and the trial court erred by admitting them.

Although we have ruled on the basis of Z's competency at the time of his hearsay statements, we would reach the same result by applying the so-called *Ryan* factors. In order to apply those factors, however, we must assume a fact that clearly is not correct—that at the time of his various hearsay statements, Z had the capacity, if he wanted to use it, to distinguish truth from falsehood.

Z's statement to the twins' father does not satisfy the *Ryan* factors. It came at a time when Z's character for truth-telling was questionable at best. It came after Z had been accosted by an adult he hardly knew, and who had just been told about highly upsetting conduct involving his own twins. It came after the adult had asked a question that assumed a fact no adult may have seen ("who showed [you] how to put [your] pee-pee in a bottom").[165] It came after Z had essentially tried to deny his way out, by claiming

---

[165]Report of Proceedings at 171, 172 (Oct. 17, 1996).

the conduct had not occurred, then by blaming it on the twins. In sum, it came when Z's general character for truth-telling was poor; when he had every motive to lie (and did so, in at least two of his three statements); when he was not acting spontaneously (he had time to fabricate at least two of his three inconsistent responses); when he was heard by only one person (the twins' father); when he was expressly asserting past facts; and when the likelihood of faulty recollection or misrepresentation was extreme. None of the *Ryan* factors indicates reliability, and Z's statement to the twins' father was not admissible under RCW 9A.44.120.

Z's statements to the child interviewer and deputy prosecutor also fail to satisfy the *Ryan* factors. Each statement was made at a time when Z's character for truth-telling was questionable at best. The statement to the interviewer was made several months after the alleged incident, and the statement to the prosecutor was made over a year later. Each statement was made in an investigatory context, for forensic purposes. Each statement was heard by only one person; indeed, the mother and grandfather were made to wait in the hall. Neither statement was recorded, and at least with one statement the interviewer's original notes were destroyed. Each statement came after *numerous* equivocal responses, and each statement was accompanied by highly inconsistent responses demonstrating an extremely confused state of mind. Each shows an inability to relate even the basic facts that a six-year-old would usually know—for example, whether the alleged sexual abuse happened on one or more than one occasion. Neither statement was spontaneous; each expressly asserted past facts; and the likelihood of faulty recollection or misrepresentation was extreme. None of the *Ryan* factors indicates reliability, and Z's statements to the interviewer

and prosecutor were not admissible under RCW 9A.44.120.[166]

## III. MISCELLANEOUS

One matter not covered herein is the admissibility of Z's hearsay statement to the doctor. No error is assigned to that, and it does not appear that a specific objection was made at trial. If proper objection is made following remand, the trial court shall consider whether Z had the capacity to distinguish truth from falsehood at the time he spoke with the doctor, whether Z was aware he was speaking for medical diagnosis and treatment, and all other circumstances affecting the statement's reliability as of the time it was made.[167]

Karpenski's remaining assignments of error lack merit or will not arise again.

Reversed and remanded.

HOUGHTON, J., concurs.

ARMSTRONG, A.C.J. (concurring in part, dissenting in part) — I concur in the majority's conclusion that Z was not competent at the time of trial. Thus, Karpenski's conviction must be reversed. But I disagree with the majority's discussion and resolution of the issue of Z's competence at the time of the out-of-court statements. I would remand and allow the parties to litigate this issue fully before the

[166]The concurrence/dissent asserts that Karpenski failed to make a specific objection, thus depriving the State of an opportunity to litigate Z's competency at the time of his hearsay statements. Karpenski, however, expressly and specifically objected to Z's statements as hearsay. One effect of that objection was to cast on the State the burden of showing that Z's statements were surrounded by "sufficient indicia of reliability," or, in alternative terms, that Z was reliable at the time of the statements. See RCW 9A.44.120. The State failed to do that, even though a pretrial hearing was held for that very purpose. Accordingly, it cannot be said that Karpenski failed to make a proper objection, or that the State lacked an opportunity to establish Z's reliability at the time of the statements.

[167]See ER 803(4); *State v. Carol M.D.*, 89 Wn. App. 77, 948 P.2d 837 (1997); *State v. Florczak*, 76 Wn. App. 55, 882 P.2d 199 (1994).

trial court. This would also require reexamination of the reliability of Z's out-of-court statements under the *Ryan* factors.[168]

Karpenski did not object to the out-of-court statements on the basis of Z's competence at the time of making the statements. Rather, in its trial brief the State raised the issue of admissibility of the out-of-court statements under RCW 9A.44.120. Karpenski then raised the issue of Z's competence in his trial brief, citing *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967), which dealt only with the competence of a witness *at trial*. And at the trial court hearing on competence and reliability of the statements, Karpenski made no specific objection to the admissibility of the statements on the basis of Z's competence at the time of making the statements. Because of this, the trial court did not rule on Z's competence at the time of the statements. Generally, on appeal a party may not challenge the admissibility of evidence on grounds not raised in the trial court. *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985). In spite of this procedurally flawed record, the majority considers the question of Z's competence at the time of the statements and then decides it on the record before us. This is inappropriate because the State has not had the opportunity to present evidence on the question.

I also disagree with the majority's reasoning in resolving the issue of Z's competence at the time of the out-of-court statements. The only question as to Z's competence arises from his apparent inability to distinguish truth from falsity. The majority reasons that this is a result of "his youth and immaturity."[169] The majority then concludes that Z was even more youthful and immature at the time of the statements and therefore he was incompetent then and presumably at all times before the trial. But no evidence supports the statement that Z's incompetence resulted solely from his youth and immaturity. It is entirely conceivable that at

---

[168]*State v. Ryan*, 103 Wn.2d 165, 203, 691 P.2d 197 (1984).

[169]*See supra* note 163 at 120.

least part of Z's difficulty with truth and falsity results from the situation he is in at the time, for example the courtroom setting as opposed to meeting with a trusted adult. Further, Z's difficulty with knowing the truth may be related to the emotional turmoil in his life at the time. In short, Z may be competent at times and in certain settings and not competent at other times and in other settings.[170] We do not know because the State has not had the opportunity to fully develop and present evidence on the matter.

The majority supports its conclusion as to Z's competence at the time of the statements by analyzing the statements themselves. But this does not supply the missing information. The statements are inconsistent, not unusual with young victims, and the circumstances suggest that much of the questioning of Z was leading and suggestive. But the critical question with Z is whether at the time of statements he knew the difference between truth and falsity. If he did, then he was competent at the time. And no amount of analysis of the statements in this record can answer this question. This, again, is because the issue was not fully litigated in the trial court.

Finally, because the *Ryan* factors overlap to some extent with the witness competence factors—particularly Z's character for veracity and his ability to understand truth and falsity—the trial court on remand should re-evaluate the statements reliability in light of the evidence produced to establish his competence.

---

[170]The majority responds to this problem by arguing that the record does not support the conclusion that Z's difficulty is situational. *See supra* note 163 at 120. I agree. But the record also does not support the majority's conclusion that Z's difficulty is due only to youth and immaturity. Again, this is because the State has not had the opportunity to present evidence on the cause of Z's difficulty.