[No. 7192–8–III. Division Three. October 21, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. RICK T. GRIFFITH, *Appellant*.

*Arthur D. Klym* and *Armstrong & Klym,* for appellant (appointed counsel for appeal).

*Curtis L. Ludwig, Prosecuting Attorney,* and *Andrew K. Miller, Chief Criminal Deputy,* for respondent.

MUNSON, J.—Rick T. Griffith appeals his conviction for committing indecent liberties with his 6–year–old daughter, referred to herein as "victim." He contends admission of the victim's out–of–court statements without permitting her to testify violated his confrontation rights as (1) the victim was erroneously found unavailable and (2) the circumstances surrounding the making of the statements demonstrate their unreliability. We reverse and remand for a new trial.

Around 6:30 p.m. on February 28, 1985, Roxie Coquillette went to the store leaving her two daughters, the victim and her 3–year–old sister, at home with Mr. Griffith and his

brother, James. James left the house sometime between 7 and 7:30 p.m.; Ms. Coquillette returned about 7:30 p.m. After returning home, she noticed the victim was looking at her in a "funny" manner, had bitten her lip, and had dark circles under her eyes as if she had been crying.

Around 9 p.m., as Ms. Coquillette was putting the victim and her sister to bed, she became concerned when the sister declared that "Daddy hurt [the victim]." Ms. Coquillette asked the victim if someone had hurt her, to which she replied yes. When Ms. Coquillette asked who, the victim refused to answer, appearing afraid. Ms. Coquillette proceeded to talk to the victim for approximately 2 hours; after considerable encouragement, Ms. Coquillette asked if her "daddy" had done this; the victim answered "yes." The victim claimed Daddy had touched her "pooky" (vagina) with his finger. Ms. Coquillette inspected the victim's vaginal area, noticing it was red and that the victim appeared to be in pain.

Ms. Coquillette took to the victim to Kennewick General Hospital where she was examined by the emergency room physician; Linda Halverson, a rape relief advocate, was also present during the examination. In response to the physician's questions, the victim again claimed her daddy had stuck his finger inside her vagina. The physician found the victim's vaginal area was extremely red and inflamed; he believed this inflammation was consistent with sexual abuse.

The following day around 11 a.m., the victim was interviewed by Detective Joy Adams and Ms. Halverson. After determining the victim knew the difference between telling the truth and lying, Detective Adams interviewed her using anatomically correct dolls. The victim used the dolls to indicate Mr. Griffith had put his hand on her vagina; she also declared he had put his "ding-dong in my pooky."

Later that evening, the victim was brought back to the police station by Ms. Coquillette, Mr. Griffith's mother, and Mr. Griffith's lawyer. Ms. Coquillette was quite upset and demanded the victim tell the detective what she had

just told her, *i.e.,* that her previous story had been a lie. The victim mumbled her previous story was a lie. In response to her mother's command to tell how her vagina had become inflamed, she replied: "You know what I told you, Mommy. I was playing." Counsel for Mr. Griffith asked: "Did Uncle Jimmy [James Griffith] do this to you?" The victim answered "yes." Defense counsel then inquired: "Did Jimmy threaten to hurt your daddy if you didn't say Daddy did it . . .?" She replied "yes." Detective Adams took the victim to another room and asked whether her original story, *i.e.,* that her father committed the act, was the truth. She answered yes, and the detective concluded the interview.

Prior to trial, the court conducted a hearing outside the presence of the jury to determine if the victim was competent to testify and if her out–of–court statements were sufficiently reliable to be admissible. Although the victim had some memory problems, she recounted the events of the alleged incident. She remembered how she had initially accused her "daddy" of committing the act; however, throughout the hearing she consistently alleged her "Uncle Jimmy" actually assaulted her.

Following the victim's testimony and that of the other witnesses, the court ruled the child was incompetent to testify at trial because of insufficient memory and because she was susceptible to leading questions; however, the court held she was competent at the time she made the statements. The court ruled the victim's declarations were reliable and admissible under RCW 9A.44.120 as statements of an unavailable child victim. It also ruled the victim's statements to her mother were admissible as excited utterances.

At trial, the victim's out–of–court statements implicating Mr. Griffith were offered through the testimony of the victim's mother, the emergency room physician, and Detective Adams. Both Ms. Coquillette and Detective Adams were cross–examined with respect to the victim's subsequent allegations against her Uncle Jimmy. However, the jury never heard the victim had testified at the pretrial hearing

that someone other than her father had committed the acts. The jury found Mr. Griffith guilty as charged on one count of indecent liberties. He appeals.

## A
### UNAVAILABILITY

 Mr. Griffith initially contends the trial court erred in admitting the victim's statements as it erroneously ruled she was incompetent to testify and, thus, unavailable.[1] He maintains the victim's testimony at the pretrial hearing clearly demonstrated she remembered the events surrounding the alleged sexual act. The admission of hearsay statements does not violate confrontation rights of the Sixth Amendment and article 1, section 22 (amendment 10) of our constitution when the hearsay declarant is either produced at trial or found unavailable, and the hearsay statements are demonstrated to be reliable. *State v. Ryan*, 103 Wn.2d 165, 170, 691 P.2d 197 (1984) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)).

*State v. Doe*, 105 Wn.2d 889, 895, 719 P.2d 554 (1986) clarified the relationship between testimonial incompetence and unavailability by stating:

> While the concepts of availability and competency do not overlap entirely, it is quite clear that an incompetent child is not available. The term "available" denotes a witness who can be confronted and cross-examined. ER 804(a)(4). A child unable to take the stand obviously cannot respond to opposing counsel's questions.

---

[1]The State contends Mr. Griffith never raised the issue of the victim's competency at trial and, therefore, the error, if any, was not preserved. We disagree. The Sixth Amendment and article 1, section 22 (amendment 10) of our constitution require a demonstration of unavailability when the declarant witness, whose testimony is to be used against the defendant, is not produced. *State v. Ryan*, 103 Wn.2d 165, 170, 691 P.2d 197 (1984) (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)). Because this showing of unavailability is constitutionally mandated, *Barber v. Page*, 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968), the issue of whether the court properly ruled the victim was unavailable by virtue of her testimonial incompetence may properly be raised for the first time on appeal. RAP 2.5(a).

■ The victim's competency to testify at the time of trial is not dispositive as to her competency at the time she made the statements and, hence, their admissibility. *Doe,* at 896, and cases cited therein. Whether a child witness is competent to testify is a discretionary determination made by the trial court after examining the child and observing her manner, intelligence, and memory. *State v. Gitchel,* 41 Wn. App. 820, 824, 706 P.2d 1091, *review denied,* 105 Wn.2d 1003 (1985). This determination will not be reversed absent an abuse of discretion. *Gitchel,* at 824.

Here, the trial court ruled the victim was incompetent to testify, after hearing from her and other witnesses; in making this ruling, the court noted:

> I find that the child is incompetent to testify at these proceedings, and particularly, that the child would qualify as to a full realization of her obligation to testify truthfully, and that she could be punished in some fashion for not telling the truth, but that her ability to detail material facts as required under that statute is totally lacking at this time. I find the child to be, at this time, highly suggestive to respond to the questions and in changing her testimony in a number of times, depending on the question and who was questioning, referring back and forth between Uncle Jimmy and Daddy, and although I quoted the [*State v. Woodward,* 32 Wn. App. 204, 646 P.2d 135 (1982)] case as for the fact that the *State v. Woodward,* in 32 Wn. App., that any inconsistencies in testimony given by a 6–year–old child would go to her credibility and not to admissibility of her testimony, I find these inconsistencies so replete in the testimony of this child and the child's conduct in court so unpredictable, that I am disqualifying her and find that she is incompetent to testify, and accordingly . . . unavailable as a witness . . .

The court's first reason for finding the victim incompetent to testify was her lack of memory at the time of trial. While the record indicates the victim was somewhat confused by the questioning, she was, for the most part, able to recall the events of the evening in question. She never wavered in her testimony that someone did, in fact, touch

her vaginal area that evening. The prosecutor himself noted the apparent accuracy and consistency of the victim's testimony while arguing her statements should be admitted. Likewise, the record clearly demonstrates the victim realized she had identified "Daddy" and not Uncle Jimmy as the perpetrator on the night of and the day following the incident. When asked why she initially stated that "daddy" had done it, she said Uncle Jimmy had threatened to "punch [her daddy] out" if she told what he (Uncle Jimmy) had done. Contrary to the court's determination, the victim did have sufficient memory to testify as to the events of the night in question; in addition, the trial court itself found she was capable of truthfully relating the events.

The trial court's second basis for disqualifying the victim from testifying was the purported inconsistency between her accusations depending on who asked the questions. The record reveals that during the pretrial hearing, the victim never testified that the defendant committed the acts; she did admit to previously stating he had committed the acts. During the pretrial hearing, however, she consistently stated that Uncle Jimmy had perpetrated the indecent liberties.[2]

---

[2] "By Mr. MILLER [the prosecutor]:

"Q. Now, who should we have this girl doll be if we're going to talk about what happened that night?

"A. Me.

"Q. OK. And who should this boy doll be?

"A. (No response.)

"Q. Was that boy doll there that night, . . .?

"A. Yeah.

"Q. OK. Well, who would that be? Who was there that night with . . .?

"A. (No response.)

"Q. Was it Greg?

"A. No.

"Q. Was it Uncle Jimmy?

"A. No.

"Q. Was it Daddy?

"A. (No response.)

"Q. Was it your daddy?

"A. No.

"Q. *It wasn't your daddy? . . . who was it?*

■ Our review of her testimony indicates the crucial issue was not whether the crime had been committed, but who had committed it. At the time of the incident, the victim said her father, Mr. Griffith; subsequently, she said Uncle Jimmy. Although the record indicates the victim may have responded to the suggestiveness of the questions,

---

"A. *Jimmy.*" (Some italics ours.)

Later, the following responses were evoked:

"Q. What did you tell your mommy happened?

"A. That—

"Q. Did you tell your mommy that somebody touched you?

"A. Yeah.

"Q. *Who did you tell your mommy touched you?*

"A. *Jimmy.*

"Q. You told your mommy that Jimmy touched you?

". . .

"Q. Would she say that Jimmy touched you?

"A. No.

"Q. Would she say that Daddy touched you?

"A. (Nods head.)

"Mr. Miller: Let the record indicate she nodded her head yes."
(Italics ours.)

The following colloquy is also pertinent:

"Q. Did you tell Linda [Halverson] that Uncle Jimmy touched [you]?

"A. Dad.

"Q. . . . was it Daddy who touched [you] that night?

"A. Huh–uh [no].

"Q. Has anybody told you not to say it was Dad?

"A. (No response.)

"Q. Has your mother ever told you to say that it was Uncle Jimmy who touched [you] that night?

"A. (No response.)

"By THE COURT:

"Q. . . . did you understand the question?

"A. Uh–huh [yes].

"Q. *Did anybody tell you to say it was Uncle Jimmy?*

"A. *My mom. No, she didn't tell me, but she told me to tell everybody that it was him, because it was him.*

"By MR. MILLER:

"Q. Did your mommy tell you it was because it was him?

"A. Yeah.

"Q. OK. But . . . do you think your mommy knows who it was, or do you think that . . . knows who it was?

"A. Mommy. *It really wasn't Dad.*

"Q. *It wasn't Dad?*

"A. *Huh–uh* [no]." (Some italics ours.)

there is, likewise, an indication she named her father as the perpetrator in response to the suggestiveness of her mother during the original questioning. Given that she remembered the incident, remembered initially stating that Mr. Griffith was the perpetrator, and was found to be capable of speaking the truth, it appears the court may have found her incompetent to testify simply because it disbelieved her testimony about Uncle Jimmy. However, the jury, not the judge, is the sole and exclusive judge of the credibility of witnesses. *State v. Randecker*, 79 Wn.2d 512, 517, 487 P.2d 1295 (1971). Moreover, any inconsistency in her testimony went to credibility and not admissibility. *State v. Woodward*, 32 Wn. App. 204, 208, 646 P.2d 135, *review denied*, 97 Wn.2d 1034 (1982). Thus, the record suggests the trial court abused its discretion in ruling the victim incompetent.

■ The State argues, however, Mr. Griffith was not prejudiced by his inability to cross–examine the victim before the jury because Ms. Coquillette and Detective Adams were cross–examined at trial with respect to the victim's statements that Uncle Jimmy and not Mr. Griffith committed the sexual abuse. However, *Ryan*, at 175, points out that:

> Where cross examination would be superfluous, the right of confrontation is not offended. Where cross examination would serve to expose untrustworthiness or inaccuracy, denial of confrontation "'"would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." . . .'" (Citation omitted.) *Davis v. Alaska*, 415 U.S. 308, 318, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974) (citing *Smith v. Illinois*, 390 U.S. 129, 131, 19 L. Ed. 2d 956, 88 S. Ct. 748 (1968)).

Moreover, *Barber v. Page*, 390 U.S. 719, 725, 20 L. Ed. 2d 255, 88 S. Ct. 1318 (1968) provides: "The right to confrontation is basically a trial right. It includes both the opportunity to cross–examine and the occasion *for the jury* to weigh the demeanor of the witness." (Italics ours.) *See also Dutton v. Evans*, 400 U.S. 74, 89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970). Here, by substituting cross examination of

the victim with that of her mother and the detective, the jury was deprived of the opportunity to observe the victim and decide which of her variations was trustworthy. Additionally, by cross-examining the mother and the detective, rather than the victim herself, the jury was never able to glean that immediately prior to trial the victim was still accusing her Uncle Jimmy and not her father. Because we find the victim was, in fact, "available", admission of the statements violated Mr. Griffith's confrontation rights.

## B
### RELIABILITY

Although unnecessary to the disposition of the case, for purposes of clarity on remand, we also examine Mr. Griffith's second contention that his confrontation rights were violated as the circumstances surrounding the victim's out-of-court statements indicated their unreliability. As noted above, the admission of hearsay statements does not violate confrontation rights when the hearsay declarant is not only found unavailable, but the statements found reliable. *Ryan,* at 170. If the statements fall within a "firmly rooted" hearsay exception, their reliability is "inferred without more . . ." *Ryan,* at 170 (quoting *Roberts,* 448 U.S. at 66). Where the statements do not fall within such an exception, they must be excluded unless the time, content, and other circumstances surrounding the statements demonstrate that they are sufficiently trustworthy to be admitted. *Ryan,* at 170.

The court here determined the victim's statements to Ms. Coquillette were admissible as excited utterances, and the statements to Detective Adams qualified under RCW 9A.44.120, the sexually abused child hearsay exception. A statement qualifies as an excited utterance if it relates to a startling event and was made while the declarant was operating under the stress or influence of that event. *Doe,* at 892–93. An excited utterance need not be contemporaneous with the event; nor must it be completely spontaneous as responses to questions may be admissible.

*State v. Slider,* 38 Wn. App. 689, 692, 688 P.2d 538 (1984), *review denied,* 103 Wn.2d 1013 (1985).

Here, the statements were made within only 4 hours from the time of the sexual abuse. However, the mother could remember little of the circumstances with respect to the conversation that took place between herself and the victim. The record does reveal Ms. Coquillette questioned and encouraged her daughter for approximately 2 hours. When during this period the victim named Mr. Griffith as the perpetrator of the indecent liberties is unclear. Ms. Coquillette did admit the victim named Mr. Griffith only in response to the leading question: "Did Daddy do this to you?" Despite the fact the statements were made within a relatively short time after the abuse, we conclude they do not qualify as excited utterances given: (1) the inadequate record with respect to the nature of the circumstances underlying the victim's statements; (2) the 2–hour interrogation by the mother; (3) the statements were made in response to leading questions; and (4) the physical evidence corroborates that abuse occurred, but not necessarily that Mr. Griffith committed it. Given these facts, we simply cannot say the circumstances surrounding the victim's statements indicate sufficient reliability to qualify as excited utterances.

This conclusion does not preclude the admission of the statements to Detective Adams or Mrs. Coquillette under RCW 9A.44.120. RCW 9A.44.120 provides that out–of–court statements, not otherwise admissible, may be introduced if: (1) the "time, content, and circumstances" of the statements provide sufficient indicia of reliability; (2) the declarant testifies or is shown to be unavailable; and (3) if unavailable, that there is corroborative evidence of the act. *Gitchel,* at 825.

Since RCW 9A.44.120 is not a "firmly rooted hearsay" exception, reliability cannot be inferred. *Ryan,* at 170. To determine reliability, *Ryan* adopted two sets of factors, one from *State v. Parris,* 98 Wn.2d 140, 146, 654 P.2d 77 (1982); the other from *Dutton,* 400 U.S. at 88–89. Both sets

of factors must be substantially met before a statement is demonstrated to be reliable.

■ Applying the *Parris* factors, the victim had an apparent motive to lie as she testified Uncle Jimmy would hurt her father if she did not say he did it; although her mother may have influenced this testimony, that does not undermine the fact that there was an apparent motive to lie. Second, although the court found the victim to be "wholly truthful," it ignored the fact she was lying about the participation of either Uncle Jimmy or Mr. Griffith. Third, only the mother originally heard this statement, although subsequent statements were heard by others. Fourth, the statements were made in response to often leading questions; they were not spontaneous. Finally, although Ms. Coquillette's later actions supported Mr. Griffith, prior to her original questioning of the victim, she had been told by her 3–year–old daughter that Mr. Griffith had "hurt" the victim.

With respect to the *Dutton* factors, the statements were expressions of past fact; they were not tied to any verbal complaints of continuing pain. Second, cross examination would have shown that the victim believed, at the time of trial, that someone other than Mr. Griffith had committed the act. Third, the victim's recollection was apparently good. Finally, as noted above, the statements were not spontaneous, and there is some possibility the victim misrepresented Mr. Griffith's involvement.

We conclude the time, content, and circumstances surrounding the victim's hearsay statements do not demonstrate adequate indicia of reliability and, thus, the trial court erred in admitting them.

Because neither unavailability nor reliability were properly shown prior to introduction of the out–of–court statements, we reverse and remand for a new trial.

GREEN, C.J., and THOMPSON, J., concur.