

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38809-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVIS MICHAEL CARNEY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Travis Carney appeals his convictions for three counts of first degree rape of a child, one count of attempted first degree rape of a child, and three counts of first degree child molestation.  He contends that the trial court abused its discretion in finding one of the child victims competent to testify and by admitting the victim's hearsay statements made during forensic interviews.  Finding no error, we affirm.

BACKGROUND

1.    ALLEGATIONS

AS and ES are sisters who lived with their mother after their father passed away. In 2012, when AS was about four years old and ES was about nine months old, their mother started dating Travis Carney.  Carney moved in with the family in 2013.  They

eventually all moved out of the apartment and into a house, and Carney and the mother had twin boys together.

At some point, Carney began sexually abusing AS on a regular basis. At first, AS did not say anything about Carney's sexual abuse. However, one day AS saw Carney touching ES around her vagina and decided to tell her mother about the abuse to protect her sister. In January 2019, AS told her mother that she was afraid that Carney was hurting ES. Her mother asked her why, and AS said he had been hurting her and she did not want it to happen to ES.

The mother kicked Carney out of the home the day after AS told her about the abuse. However, she did not report the abuse until May 2019. Carney was eventually charged with multiple counts of rape of a child and child molestation.

2.    CHILD HEARSAY AND COMPETENCY HEARING

After the abuse was reported, Tatiana Williams, a forensic interviewer, conducted two interviews with ES where she asked ES questions about Carney abusing her. At the time of the interviews, ES was 7 years old. Prior to trial, the State moved to admit ES's statements to Williams as child hearsay. Carney challenged both the competency of ES to testify at trial and the admissibility of ES's prior statements.

A. *Williams' Pre-Trial Testimony*

At the pre-trial hearing, Williams testified and explained her interview process and

methodology.  Williams said that she formatted her interview questions differently based

on the age of the child, using more focused questions for younger children:

> So for younger children, like the kindergarten or preschool age children,
> it's often difficult for them to understand a broader question that says like
> tell me everything.  So then I have to be a little bit more specific and say,
> you know, tell me what you did, you know, in your bedroom or whatever,
> tell me what you did this morning.
>
> So just being a little bit more focused because they don't have the
> ability to understand a broader question, but then with like a teenager, you
> can be a little bit more open because they have the ability to decipher
> between those things.

Rep. of Proc. (RP) at 19.  Williams explained that these more focused questions were not

leading because she is still asking questions and not suggesting answers.

Defense counsel asked Williams about whether she had asked ES to explain the

difference between a truth and a lie in either of the interviews.  Williams admitted that

she had not, but explained that it was no longer "a part of standard protocol" to ask

children to define truth and lie during forensic interviews.  RP at 38-40.  She said that,

based on updated research, a child's ability to define truth and lie or provide examples of

truths or lies does not indicate an ability to testify truthfully about what occurred to them

or what they witnessed.  She further explained that it has been found that asking a child to

promise to tell the truth was more indicative of them being able to provide truthful information, and for this reason, Williams had not asked ES to define a truth or a lie.

### B. *Forensic Interviews*

Williams testified that she conducted two interviews with ES in 2019, the first on May 28, and the second on June 19. ES was in first grade at the time of the interviews. Williams started both interviews by going over the "rules" for the interview room. She explained that she was going to ask ES questions and if ES did not know the answer, she was not supposed to guess but should just respond by saying that she does not know the answer.

During the first interview, Williams then asked ES to practice not guessing with her:

Q: … If I said, let's see, [ES], what is my favorite food? What would you say?

A: Um, grapes.

Q: Did I tell you my favorite food? My favorite food. Do you …

A: Ah …

Q: … know my favorite food?

A: Yes.

Q: I didn't tell you my favorite food. No, but there's no guessing. Let's practice one more time. If I said, let's see, [ES], what is my favorite movie? What would you say?

A: Snow White?

Q: Okay. Um, I didn't tell you my favorite movie. What is your favorite movie?

A: Um, Cinderella.

Q: Cinderella? Okay. So remember, no guessing. If you don't know the answer, it's okay to say, "I don't know." Okay?

A: Okay.

Q: All right. And, um, if I use hard words when we talk, I want you to tell me.

A: Okay.

Q: Okay? So make sure that, um, I use words that you know. So if I said, [ES], what is your gender? What would you say?

A: I don't know.

. . . .

Q: … And if I get something wrong when we talk, I want you to tell me.

A: Okay.

Q: Make sure I get everything right. So if I said, um, [ES], you told me that your favorite movie is Frozen. What would you say?

A: Um, no.

Ex. P-8 at 3-4.

During the second interview, Williams also practiced not guessing with ES:

Q: … If I said, [ES], what is my favorite color, what would you say?

A: Uh, blue.

Q: But did I tell you my favorite color?

A: No.

Q: No, I didn't tell you. Remember no guessing? We'll practice one more time. If I said, [ES], what is my last name, what would you say?

A: Ah, I don't remember.

Ex. P-9 at 5-6. Williams later asked ES, "So if I said, [ES], you told me, let's see, your favorite color is gray, what would you say?" ES responded that her favorite color was not gray but purple and pink. Ex. P-9 at 6.

Williams also explained during both interviews that they were only to talk about things that were true and that really happened. And at both interviews, ES promised to tell the truth.

During the first interview, ES said that Carney had showed her videos of "how to make babies." Ex. P-8 at 10-17. ES described the video in detail, including how there was a "boy" and a "girl" who were naked and the boy was "trying to get, um, his private in the girl's mouth." Ex. P-8 at 10-17.

ES also made multiple disclosures about Carney's abuse. She said that, on two occasions, Carney "was putting his finger in [her], um, private." Ex. P-8 at 18. Williams asked ES to "tell [Williams] everything that happened" when Carney put his finger in her private the first time. ES responded, "he, um, he pushed in really cl- he pushed in really, um, closed and then I said, 'Ow.' And then he, um, I started crying because he really hurted me." Ex. P-8 at 19. ES said that she had been at home on the couch with Carney when this happened and that AS saw it occur. ES also said that she was in kindergarten when that incident occurred.

The second time Carney put his finger in her private, ES initially said her mom saw it happen. However, she subsequently said that she was at home when it happened and her mom was at the store. ES initially seemed to say that she was in Carney and her mother's bedroom during the second incident, but she subsequently clarified that she was sitting on Carney's lap playing a game on his phone when he put his finger through her pants and in her private "for a long time." P-8 at 32-34, 36.

She also said that Carney had tried to force his "private" into her mouth and he had a "ring" that he put into her private. Ex. P-8 at 10-11. She said that AS was aware of Carney's abuse and "then my mom knowed about what [Carney] was doing to me." Ex. P-8 at 11.

During the second interview, ES further discussed the incident where she said Carney had tried to put his private in her mouth. She said that she was sleeping in her bed in the basement and woke up to Carney opening her mouth and "then he, um, put it in, like, (unintelligible) in my mouth." Ex. P-9 at 25. ES said she told Carney to leave and then her mom woke up and called the police. However, ES then said that Carney claimed to have been sleepwalking and then her mother came downstairs and asked what was going on. ES said she told her mom, "Dad hit me in the face and I punched him in the face because he was waking me up," and her mother took Carney upstairs. Ex. P-9 at 28. ES also said AS knew that Carney had put his private in ES's mouth because AS had been watching on "CramLock" or "camera stuff" and told ES about it.

7

Williams then told ES to tell her everything she had seen when Carney put his

private in her mouth. ES responded by saying that it was really loud and her bed was

squeaking. She also said that she had a friend named Bridget spending the night and

Carney kicked Bridget in the face and "she really got hurt." Ex. P-9 at 30. She also said

AS's friend Emily was spending the night. ES then clarified that Carney had put his

private in her mouth on multiple occasions. Williams also asked ES to tell her everything

she had smelled and tasted when Carney put his private in her mouth.

ES also told Williams that Carney had put a "ring" in her "butt" when she was on

her mother's bed and her clothes and underwear were pulled down. She said the ring was

purple, had a big bump, and was made of gems. When Carney put the ring in her butt,

ES said it "really hurt" and felt "freezing cold." Ex. P-9 at 41-42.

### C. *Mother's Testimony*

ES's mother testified at the hearing and was asked whether, during the timeframe

when ES was five to six years old, she would describe her as truthful. She responded:

"On occasion, she would. She, also, lived in her head. So it was, also, fantasy land. So

we couldn't really determine truth at that time because we didn't know where she was

mentally." RP at 248. The mother then explained that ES was diagnosed with ADHD[1]

and had started taking medication when she was in kindergarten. After she started taking

---

[1] Attention-deficit/hyperactivity disorder.

medication, ES became "[m]uch calmer, much more able to tell us what exactly happened, more detail, more truthful."  RP at 249.

During cross-examination, the mother also explained what she meant by "fantasy land":

> Q: When you're talking about fantasy land, what are you talking about?
>
> A: That she was into horses so unicorns, gum drop trees, just like fairies being involved in her world.
>
> Q: Okay. And that get [sic] convoluted when you were trying to talk to her about real things?
>
> A: If she didn't want to talk about it, she would resort to her fantasy land because she didn't want to talk about the seriousness of things.

RP at 264-65.

The mother also testified that ES, at some point, had disclosed to her that she had been sexually abused by Carney but did not provide much detail.  She said that ES was afraid that she would get in trouble for the disclosures.

The mother explained that her and Carney used sex toys, including butt plugs.  She said that some of them were purple and a couple of them had gems on them.

### D. ES's Testimony

ES, who was nine years old at the time of the hearing, also testified.  ES said that at home she had rules about telling the truth: "If you lie to my mom, you will get in big trouble, and if you tell the truth . . . you won't get in as much trouble."  RP at 287-88. The prosecutor asked ES, "I'm wearing a bright orange jacket, is that the truth or a lie?"

9

RP at 288. ES responded, "Lie." The prosecutor then asked, "I'm wearing a pink shirt, is that the truth or a lie?" RP at 288. ES responded, "truth." *Id.* ES then promised to tell the truth at the hearing.

When asked if she saw anyone who looked like Carney, ES was unable to identify him. However, the trial court noted just prior to ES's testimony that the face shield Carney was wearing had a "bad glare" on it and also later determined that Carney did not need to wear the face shield due to the glare.

ES was able to recount details from the time period when the abuse occurred. Although she lived in an apartment at the time of trial, ES testified that she had previously lived in a house with Carney, her mother, AS, and her two brothers. She said that she and AS had shared a bedroom in the basement while her brothers slept in a room with a bunkbed upstairs, and Carney and her mother were in another room upstairs. ES also testified that she referred to Carney as "dad," Carney would play games like "feed the hippo" with her, and he was in the Army. RP at 289-90.

ES also testified about the sexual abuse. She said that Carney tried to put his "private" in her mouth, but she moved her head so he was unable to actually put it in her mouth. ES also explained that Carney touched her "front private" on the couch with his hand when she was four years old, and it felt uncomfortable. RP at 291-92. She said that he touched her front private with his hand on multiple occasions.

10

ES said that Carney had used a "long stick" that was pink and purple with something that looked like a green button to touch her private. She also said that Carney used a ring on her butt with a diamond on the end and a white "circle kind of thing at the front" but she had told him to take it out "because it hurt." RP at 293.

ES said that she did not remember whether AS ever saw any of the abuse and her mother did not see any of it because she would be gone when it would happen. She did remember telling Williams and her mother about the abuse. However, on cross-examination, ES said she did not remember talking to Williams and had only talked to her counselor and her mother about what had happened.

When asked to define a lie, ES responded that a "lie is something that is made up or something is—something is not true" and that it was not the same thing as making a mistake. RP at 295-96. Defense counsel also, on cross-examination, asked ES about prior contradictory statements she had made that her mother and AS had witnessed the abuse. ES denied having ever said that AS saw Carney abusing her.

At the conclusion of the hearing, the trial court made detailed findings on the *Allen*[2] factors for competency and found that ES was competent to testify. The court also made findings on the nine *Ryan*[3] and *Dutton*[4] factors and held that ES's prior hearsay

---

[2] *State v. Allen*, 70 Wn.2d 690, 424 P.2d 1021 (1967).

[3] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

[4] *Dutton v. Evans*, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970).

statements were admissible. The court's detailed findings are set forth in the analysis of each issue below.

The case proceeded to a jury trial at which ES testified and her statements made to Williams during both forensic interviews were admitted. Carney was found guilty of all charges.

Carney appeals, challenging the trial court's conclusion that ES was competent to testify and that her hearsay statements should be admitted at trial.[5]

## ANALYSIS

1.   COMPETENCY TO TESTIFY

Although Carney contends that the trial court abused its discretion in finding ES competent to testify, his primary challenge on appeal focuses on whether substantial evidence supports the court's findings pertaining to the *Allen* factors.

Individuals must be competent to testify. RCW 5.60.020. There is a presumption that all witnesses, including child witnesses, are competent. ER 601; *Id.* "A party challenging the competency of a child witness has the burden of rebutting that presumption with evidence indicating that the child is . . . incapable of receiving just impressions of the facts, or incapable of relating facts truly." *State v. S.J.W.*, 170 Wn.2d 92, 102, 239 P.3d 568 (2010).

---

[5] The notice of appeal has not been designated as part of the record on appeal.

Our review is limited to determining if the challenged findings are supported by substantial evidence and whether those findings support the trial court's conclusions of law. *State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018). If the findings and conclusions are supported by the record, then the trial court's ultimate determination of competency is reviewed under a very deferential abuse of discretion standard. *State v. Woods*, 154 Wn.2d 613, 617, 114 P.3d 1174 (2005). As the trial court is in the best position to observe potential witnesses, "particular reliance" is placed on the trial court's assessment of a child witness' competency. *State v. Kennealy*, 151 Wn. App. 861, 878, 214 P.3d 200 (2009). In considering whether the court abused its discretion, we consider the entire record on appeal. *State v. Avila*, 78 Wn. App. 731, 737, 899 P.2d 11 (1995).

In determining whether a child witness is competent to testify, trial courts consider the five *Allen* factors:

> A child witness is competent to testify if he or she: (1) understands the obligation to speak the truth on the witness stand; (2) has the mental capacity at the time of the occurrence to receive an accurate impression of it; (3) has a memory sufficient to retain an independent recollection of the occurrence; (4) has the capacity to express in words his or her memory of the occurrence; and (5) has the capacity to understand simple questions about the occurrence.

*Kennealy*, 151 Wn. App., 877-78.

Although Carney assigns error to the trial court's findings pertaining to each of the five *Allen* factors, he provides argument and analysis on only the first two issues: whether

13

ES understood the obligation to speak the truth and had the capacity at the time of the

abuse to receive an accurate impression of it.[6] We hold that substantial evidence supports

the challenged findings.

    *A.  Obligation to Speak the Truth*

    The first *Allen* factor a court must consider is whether the witness "understands

the obligation to speak the truth on the witness stand."  *Kennealy*, 151 Wn. App. at 877.

A child who has a long-standing history of demonstrating an inability to distinguish what

is true may be found incompetent to testify.  *Id*. at 878.  But a demonstrated inability to

discern the truth is different from inconsistencies in a child's testimony, which go to

weight and credibility, not competency.  *Id*.

    The trial court found that ES demonstrated an understanding of her obligation to

tell the truth and had a general character for truthfulness.  Clerk's Papers (CP) at 181.

The court also found that although ES had been diagnosed with ADHD, there have not

been issues with lying.  Finally, the court found that ES acknowledged that she "gets into

more trouble if she tells a lie," and "demonstrated an understanding of the difference

between the truth and a lie."  CP at 181.

    During the interviews and her testimony, ES made several promises to tell the

truth.  In addition, ES testified as to the importance of telling the truth, was able to

---

[6] *See State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660 (2008) ("Passing
treatment of an issue or lack of reasoned argument is insufficient to allow for our

describe in her own words the difference between a truth and a lie, and was able to

distinguish between a truth and a lie.  An affirmative answer in response to a prosecutor's

question regarding whether it is important to tell the truth is sufficient to meet this first

factor.  *See Avila*, 78 Wn. App. at 736.

Carney contends that these findings are not supported by substantial evidence.

Instead, he argues that the evidence demonstrated that ES was unable to understand the

difference between a truth and a lie and the importance of telling the truth on the witness

stand.  Specifically, he argues that Williams' techniques were deficient, and the only

thing ES could distinguish was different colors.

Carney points to ES's attempts to guess the answers to questions posed by

Williams during the forensic interviews as evidence that she did not understand the

obligation to speak the truth on the witness stand.  While ES initially struggled with

guessing the answers to questions, her ability to follow instructions, and not guess at

answers, improved during the second forensic interview.  Moreover, Carney does not

explain how ES's guessing during the forensic interviews related to her understanding of

the obligation to tell the truth when she testified two-and-a-half years later at trial.

Carney also challenges the interview techniques of Williams, the forensic

interviewer.  But his challenge goes to her credibility, which is something we do not

---

meaningful review."), *rev'd on other grounds,* 170 Wn.2d 117, 240 P.3d 143 (2010).

decide on appeal. He claims that Williams failed to probe whether ES knew the difference between the truth and a lie and simply asking ES to promise to tell the truth was not probative of whether she understood her obligation. At the pre-trial hearing, Williams testified that studies have shown that asking a child to promise to tell the truth has a higher correlation to truth-telling than asking them to distinguish between a truth and a lie. Carney did not challenge Williams' testimony or techniques through cross-examination or other evidence. He cannot meet his burden of rebutting the presumption of competency by claiming for the first time on appeal that there are perceived credibility issues or that an expert's techniques were inadequate.

Carney contends that ES's pre-trial testimony that "[i]f you lie to my mom[,] you will get in big trouble, and if you tell the truth [and] you won't get in as much trouble," fails to demonstrate an understanding to tell the truth in court. We disagree. It is clear from this statement that ES understood the importance of honesty. Moreover, this statement coupled with ES's statements about the color of the prosecutor's clothing and her definition of a lie during the hearing were more than sufficient to support the trial court's finding that ES understood her obligation to speak the truth on the witness stand.

Finally, Carney claims the prosecutor's colloquy with ES was inadequate, citing a law review article suggesting that truncated competency hearings that focus solely on a child witness's ability to identify a lie based on the color of an object are insufficient. *See* Laurie Shanks, *Evaluating Children's Competency to Testify: Developing a Rational*

16

*Method to Assess a Young Child's Capacity to Offer Reliable Testimony in Cases Alleging Child Sex Abuse*, 58 CLEV. ST. L. REV. 575, 584-85 (2010).  This article does not support Carney's argument.

The law review article contends that decisions on competency that are based solely on asking if a child knows the difference between a red pen and a black pen fail to explore the critical skills for determining if a child can testify accurately and truthfully. *Id*.  But in Washington, and particularly in this case, the court's decision on competency was not based solely on whether ES knew the difference between an orange jacket and a pink shirt.  Instead, just as the article suggests, the *Allen* factors considered by the trial court addressed all of the "salient questions" the article suggests are necessary to determine if a child has the critical skills to testify accurately and truthfully.  *Id*.

Here, there is substantial evidence to support the trial court's finding that ES understood the obligation to testify truthfully.

B.  *Capacity to Receive Accurate Impression of Events*

The second *Allen* factor requires the trial court to consider whether the child "has the mental capacity at the time of the occurrence to receive an accurate impression" of the event.  *Kennealy*, 151 Wn. App. at 877.

The trial court found that ES was capable of receiving just impressions and relating them truthfully.  The court noted that "[w]hile E.S. could not remember some details, she was still able to relate what happened," including where and with whom she

lived with at the time of the incident. CP at 181. These findings are supported by substantial evidence.

During the child hearsay hearing, ES demonstrated that she remembered details from the time the abuse occurred. She offered testimony regarding her family's living situation at the time, including who lived in what room in their house, her relationship with Carney, and Carney's employment. This testimony was more than sufficient to show that ES had the mental capacity at the time of the abuse to receive an accurate impression of it. *See Avila*, 78 Wn. App. at 733-34, 736 (child witness demonstrated mental capacity at the time of the incident to receive an accurate impression of the incident where, although she found it difficult to discuss the incident, she was able to remember details of a trip three months before the hearing).

Carney argues that the trial court erred in making this finding, pointing to the fact that ES was unable to identify him in the courtroom to support his argument for lack of mental capacity. Although ES was unable to identify Carney initially during the child hearsay hearing, the trial court noted on the record that Carney was wearing a face shield and there was a glare on the shield. ES's inability to identify Carney at the hearing does not demonstrate an inability to receive accurate impressions of events. Indeed, there was testimony at trial that Carney's appearance had changed dramatically since he had moved out of the family home. RP at 341-42.

C. *Last Three* Allen *Factors.*

18

Carney assigns error to the trial court's findings of fact relevant to all five *Allen*

factors but fails to specifically challenge the last three *Allen* factors in his briefing.

Regardless, we find that substantial evidence supports the trial court's findings on these

factors.

The trial court found that ES's testimony in court and during the interview

demonstrated that she had a sufficient memory to retain an independent recollection of

the occurrence. Although ES's testimony regarding the abuse was not always consistent

or complete, she was able to remember specific instances of abuse during both the

forensic interviews and her testimony during the child hearsay hearing, including when

Carney tried to put his penis in her mouth, put a "ring" with jewels on it in her butt, and

put his fingers in her "private." Inconsistencies alone do not demonstrate insufficient

memory as inconsistencies in testimony are pertinent to weight and credibility, not

competency. *See Kennealy*, 151 Wn. App. at 878.

The court also found that ES's ability to explain in her own words the events in

question and answer questions about it showed that she had the capacity to express in

words her memory of the occurrence. ES provided a clear account of the abuse at the

child hearsay hearing. Although she did not have words to specifically or correctly

identify some items, body parts, and actions, she communicated what had occurred

sufficiently for the court to understand.

19

Finally, the court's finding that ES had the capacity to understand simple questions about the occurrence was also supported by substantial evidence. ES recounted the abuse multiple times in response to the prosecutor and defense counsel's questions during the interviews and child hearsay hearing and was able to answer questions regarding what she saw, what she heard, and what she felt when the abuse was occurring.

Substantial evidence supports the trial court's findings on each of the five *Allen* factors. Since the court considered the five *Allen* factors before concluding that ES was competent to testify, it did not abuse its discretion.

2.     ADMISSIBILITY OF CHILD HEARSAY

Carney argues that the trial court abused its discretion in admitting ES's statements from the forensic interviews as child hearsay and assigns error to several of the trial court's findings of fact supporting this decision. We find no abuse of discretion and affirm.

This court reviews "a trial court's decision to admit child hearsay statements for an abuse of discretion." *Kennealy*, 151 Wn. App. at 879. A trial court abuses its discretion if its decision is unreasonable or based on untenable grounds or reasons. *Kennealy*, 151 Wn. App. at 879.

As explained above, this court reviews a trial court's findings of fact for substantial evidence. *Coleman*, 6 Wn. App. 2d at 516. Substantial evidence is evidence sufficient to persuade a reasonable person of the truth of the finding. *Id.*

20

A statement that is otherwise inadmissible as hearsay may be admissible in criminal proceedings if it is made by a child under the age of ten "describing any act of sexual contact performed with or on the child by another" or "describing any attempted act of sexual contact with or on the child by another." RCW 9A.44.120(1)(a)(i). Prior to admitting such evidence, the court must conduct a hearing and determine that the "time, content, and circumstances of the statement provide sufficient indicia of reliability" and the child either testifies at the proceedings or is unavailable as a witness. RCW 9A.44.120(1)(b)-(c).

In determining the reliability of the child hearsay statement, the trial court should consider the nine *Ryan* factors:

> (1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statement; (4) the spontaneity of the statements; (5) the timing of the declaration and the relationship between the declarant and the witness; (6) whether the statement contained express assertions of past fact; (7) whether the declarant's lack of knowledge could be established through cross-examination; (8) the remoteness of the possibility of the declarant's recollection being faulty; and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*Kennealy*, 151 Wn. App. at 880 (footnote omitted).

No single factor is dispositive. *Id* at 881. Rather, reliability is based on an overall evaluation. *Id.* However, for a statement to be found reliable, collectively the factors

21

must be "substantially met." *State v. Griffith*, 45 Wn. App. 728, 738-39, 727 P.2d 247

(1986).

### A. *Motive to Lie*

The trial court found that ES did not have a motive to lie. Carney does not argue

that ES had a motive to lie, and there was no evidence that she did. On the contrary, ES's

testimony that she had a good relationship with Carney and called him "dad" tended to

show that she had no motive to lie. Additionally, there was evidence that ES was actually

afraid of getting in trouble if she disclosed the abuse to her mother, further supporting

this finding. Thus, this factor weighed in favor of admissibility.

### B. *General Character of Declarant*

Carney argues that the trial court erred in finding that ES had a general character

for truthfulness. He points out that ES's mother testified that ES tended to revert to

"fantasy land" when asked questions and was honest "on occasion" but had been

diagnosed with ADHD. Although the mother made statements regarding ES being

truthful on occasion and her tendency to revert to fantasy land during the time period

when she was abused, the details the mother provided to explain her testimony did not

demonstrate that ES was untruthful. Rather, it demonstrated that ES would avoid

questions if she did not want to discuss a topic. Instead of answering a question

untruthfully, ES would go into a world of her own imagination with "unicorns, gum drop

trees, . . . fairies." RP at 264. In other words, ES's ADHD did not appear to cause her to be untruthful but rather avoidant and distracted.

Even if the ADHD impacted ES's character for truthfulness, the mother explained that any issues substantially subsided after ES started taking medication when she was in kindergarten. As ES was in first grade when the interviews with Williams occurred, and when she made her statements, this was well after she had been diagnosed and treated. Accordingly, based on her mother's testimony, any issues with reverting to fantasy land had been resolved.

Carney also claims that ES's ADHD diagnosis "was a serious diagnosis that went directly to the Ryan factors and should have been deemed fatal to the hearsay question." Br. of Appellant at 29. He further maintains that the fact that ES had been prescribed an unspecified medication made the finding of hearsay reliability untenable. This argument is purely speculative as the only evidence in the record is that the medication helped ES. If Carney believed otherwise, then he could have cross-examined the witnesses on this theory and produced this evidence at the pre-trial hearing.

### C. *Number of witnesses to statement*

The third *Ryan* factor is whether more than one person heard the statements. The trial court did find that ES made statements regarding the abuse to both the mother and Williams. However, our Supreme Court has determined that this factor is largely

irrelevant in cases such as this where a statement was recorded.  *See State v. Rice*, 120

Wn.2d 549, 567-68, 844 P.2d 416 (1993).

### D.  Spontaneity

Carney argues that the trial court erred in finding that ES's statements to Williams

were spontaneous and in response to non-leading questions.  Carney claims that ES's

"most inculpatory statements were made in response to improperly leading and

suggestive" questions.[7]  Br. of Appellant at 34.

The definition of spontaneous under the *Ryan* factors is interpreted more broadly

and considers the entire context within which a child makes a statement.  *State v.*

*Henderson*, 48 Wn. App. 543, 550, 740 P.2d 329 (1987).  Generally, "for purposes of

determining the reliability of a statement made by a child victim of sexual abuse, any

statements made that are not the result of leading or suggestive questions are

spontaneous."  *In re Dependency of S.S.*, 61 Wn. App. 488, 498, 814 P.2d 204 (1991).

Thus, in *Henderson*, the court determined that a detective's question to a child victim

regarding why it hurt when her father touched her vagina was not leading or suggestive

where the child had already volunteered the information that her father had touched her

---

[7] Carney also argues that Williams' understanding of what qualified as a "leading question" did not conform with the law.  It is unclear, though, what bearing Williams' ability to give a proper legal definition of "leading question" had on whether she used non-leading questions.

vagina and it had hurt. 48 Wn. App. at 546, 550. The question drew on prior information provided by the child, and therefore her answer still qualified as spontaneous. *Id.* at 550.

Similarly, here, Williams' questions generally drew on prior information that ES had provided and therefore were not leading. And Carney only provides two examples to support his claim that Williams asked leading questions. The first is when Williams asked, "Tell me everything you smelled when [Carney] was putting his private in your mouth." Ex. P-9 at 33. The second is when Williams said, "when you were telling me about being in the basement downstairs and [Carney], um, putting his, um, his private in your mouth, tell me everything you tasted when that happened." Ex. P-9 at 35. Carney claims that because ES had not used the terms smell or taste previously in her interviews, the questions were leading and suggestive.

Carney's argument fails because the questions were not leading. Williams testified it is difficult for younger children to understand broad questions, so the questions need to be more specific. Although the questions may have been more directed, they did not suggest a specific answer. *State v. Scott*, 20 Wn.2d 696, 698-99, 149 P.2d 152 (1944) ("In order to elicit the facts, a trial lawyer may find it necessary to direct the attention of a witness to the specific matter concerning which his testimony is desired, and, if the question does not suggest the answer, it is not leading."). Instead, the questions drew on prior information provided by ES (that Carney had put his private in ES's mouth) and did not suggest that ES had smelled or tasted anything in particular. Because the questions

were not leading or suggestive, under the broader definition of spontaneous given to

statements under *Ryan*, substantial evidence supports the trial court's finding that ES's

answers were spontaneous.

### E. Timing and Relationship

The fifth *Ryan* factor is the timing of the declaration and the relationship between

the declarant and the witness to the statement. Carney assigns error to the trial court's

findings that ES disclosed the abuse close in time to when it occurred and that the timing

and relationship between ES and Williams suggested trustworthiness. Carney maintains

that ES did not disclose the abuse "anywhere even remotely close in time" to when it

occurred and the abuse was only reported to police months after the mother kicked

Carney out of the home. Br. of Appellant at 33.

However, "a trial judge may find child hearsay statements unreliable on the

ground that there has been a lapse of time and intervening counseling between the abuse

and the statements at issue only when the evidence demonstrates that the lapse or

counseling somehow affected the child's statements." *State v. Carlson*, 61 Wn. App.

865, 872-73, 812 P.2d 536 (1991). Here, Carney only asserts that the lapse of time

affected ES's statements and provides no additional support for this statement. This is

insufficient. Additionally, although there was a lapse in time between the abuse and ES's

interviews with Williams, it appeared that this lapse was a matter of months and not

years.

26

Carney offers no argument regarding the impact of the relationship between ES and Williams on reliability. And in fact, as the State points out, the fact that Williams was a trained professional, in a position of trust with ES, and her interview with ES occurred in a trusting, comfortable space likely enhanced the reliability of ES's statements. *See Kennealy*, 151 Wn. App. at 884.

Thus, there was substantial evidence to support the trial court's finding that ES disclosed the abuse close in time to when it occurred and the timing and relationship between ES and Williams suggested trustworthiness.

F. *Express Assertions of Past Fact*

The sixth *Ryan* factor is whether the statement contained express assertions of past fact. Because child hearsay statements about sexual abuse generally include statements about past facts, courts have determined that this factor is not useful in weighing the reliability of child hearsay statements. *See State v. Karpenski*, 94 Wn. App. 80, 109 & n.125, 971 P.2d 553 (1999), *abrogated on other grounds by State v. C.J.*, 148 Wn.2d 672, 63 P.3d 765 (2003); *State v. Stange*, 53 Wn. App. 638, 647, 769 P.2d 873 (1989) ("For practical purposes, it appears that the trial court can ignore questions as to whether the statement does or does not contain assertion as to past fact, so long as it evaluates the other factors indicating reliability in the context of the facts of the particular case before it."). Thus, we need not evaluate this factor.

G. *Declarant's Lack of Knowledge*

The seventh *Ryan* factor is whether the declarant's lack of knowledge could be established through cross-examination. This factor has also been determined to be generally unhelpful as it is unlikely that a trial court "can conscientiously find that cross examination might not show lack of knowledge." *State v. Borland*, 57 Wn. App. 7, 19, 786 P.2d 810 (1990), *abrogated on other grounds by State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997). And here, there is no reason to believe Carney was not able, through cross-examination, to establish ES's lack of knowledge.

And even if this court does consider this *Ryan* factor, as the trial court found, ES remembered enough from the time period when the abuse occurred that she could be cross-examined on the statements. She was able to articulate who Carney was and his relationship to the family and did remember some specifics from the abuse, although she did not remember everything that she had relayed to Williams. Accordingly, there was substantial evidence supporting the trial court's finding that ES's lack of knowledge could be established through cross examination.

### H. *Possibility of Faulty Recollection*

The eighth *Ryan* factor is the remoteness of the possibility of the declarant's recollection being faulty. This factor has also been determined to be unhelpful as it is already covered in the factor considering the timing of the declaration. *See Borland*, 57 Wn. App. at 19-20. Therefore, this factor is not pertinent in the analysis.

28

Nonetheless, as noted above, ES's statements in the forensic interviews were made relatively close in time to the alleged abuse. And although she was inconsistent at points and recounted different details of abuse during the two separate interviews, there is nothing in the interviews indicating that her recollection was significantly flawed or faulty. Thus, there was substantial evidence supporting the trial court's finding that the possibility of ES's recollection being faulty was remote.

### I. *Surrounding Circumstances*

The ninth *Ryan* factor is whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement. Neither party offers argument regarding this factor, and it has also been found to be duplicative and unhelpful as it is already covered by the third, fourth, and fifth *Ryan* factors. *See Id*.

Even so, as explained above, there was no evidence that ES had a motive to lie because, by all appearances, she had a good relationship with Carney and called him "dad." And there was no evidence that anyone else suggested or encouraged ES to invent abuse allegations against Carney. In fact, the inconsistencies in her testimony tended to render her allegations more credible as they showed that she was not simply repeating a rehearsed, made-up story.

In sum, there is substantial evidence to support the trial court's finding that ES's statements met the *Ryan* factors. Other than challenging the evidence to support the court's findings, Carney raises no other challenge to the trial court's discretionary

29

decision to admit the hearsay statement. We therefore conclude that the trial court did not abuse its discretion in admitting the statements.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.